[No. G029791. Fourth Dist., Div. Three. Mar. 22, 2002.]

RENEE J., Petitioner, v.
THE SUPERIOR COURT OF ORANGE COUNTY, Respondent;
ORANGE COUNTY SOCIAL SERVICES AGENCY et al., Real Parties
in Interest.

COUNSEL

Carl C. Holmes, Public Defender, James Steinberg, Assistant Public Defender, and Paul T. DeQuattro, Deputy Public Defender, for Petitioner.

No appearance for Respondent.

Benjamin P. de Mayo, County Counsel, and Julie J. Agin, Deputy County Counsel, for Real Party in Interest Orange County Social Services Agency.

Van Deusen, Youmans & Walmsley and Ted R. Youmans for Real Parties in Interest Kenneth J. and Connie J.

Law Offices of Harold La Flamme, Harold La Flamme; John L. Dodd and Karen J. Dodd for Real Party in Interest the Minor.

OPINION

**SILLS, P. J.**—Renee J. petitions for extraordinary relief from the trial court's order terminating her reunification services with her daughter,

Sayrah R., and resetting the matter for a permanency planning hearing. She contends the trial court erred in applying the California Supreme Court's interpretation of Welfare and Institutions Code section 361.5, former subdivision (b)(10)[1], adjudged in an earlier phase of this case (*Renee J. v. Superior Court* (2001) 26 Cal.4th 735 [110 Cal.Rptr.2d 828, 28 P.3d 876]), because the California Legislature almost immediately overrode that interpretation by amending the statute. In the unusual (to say the least) circumstances of this case, we agree. We conclude the Legislature intended its statutory amendment to be a clarification, and applied to all cases still pending, including this one. That retroactive clarification of the law provides an exception to the doctrine of law of the case. Although the trial court had no way of knowing about the statutory change at the time it ruled, and thus cannot be faulted for that ruling, it is proper for Renee to raise the legal argument for the first time at the appellate level, and proper for us to reverse the trial court's ruling.

This case, and more specifically the issue of providing reunification services, has a unique history in the annals of California jurisprudence. Renee earlier petitioned this court for relief when the trial court denied her reunification services at the dispositional hearing pursuant to former subdivision (b)(10). In that earlier petition, the primary issue was whether former subdivision (b)(10) authorized the court to deny reunification services to a parent who had previously failed to reunify with another child, even without an additional finding that the parent had "not subsequently made a reasonable effort to treat the problem which led to the removal [of the prior child.]" The Orange County Social Services Agency (SSA) contended that the "no reasonable effort" finding was required only in the case of a parent who had had his or her parental rights terminated in the case of a prior child, but that no such finding was necessary to deny reunification services to a parent who had previously failed at reunification.

We concluded that a proper interpretation of the language in former subdivision (b)(10) required the court to make a finding that the parent had not made a reasonable effort to treat the problem which had led to the prior removal of another child, before denying services to *either* a parent who had failed to reunify with the other child *or* a parent who had rights terminated to the other child. On the basis of that interpretation, we determined that former subdivision (b)(10) did not authorize denial of services on the evidence which had been presented in this case, and ordered the case remanded with instructions to hold a new dispositional hearing at which reunification services would be offered.

---

[1] All further statutory references are to the Welfare and Institutions Code, unless otherwise indicated. All references to section 361.5, former subdivision (b)(10) of this code (as amended by Stats. 2000, ch. 824, § 5) are referred to as former subdivision (b)(10).

During the time her petition was pending before us, Renee made efforts, albeit imperfect ones, to demonstrate her commitment to sobriety. After her release from jail in April of 2000, she began looking for employment. She also began a perinatal drug program, and was given referrals to parenting classes. However, during June and July of 2000, Renee missed several scheduled drug tests, and then tested positive for methamphetamine on July 31, 2000. Renee's drug counselor was concerned that "[t]hings are slipping."

SSA petitioned the California Supreme Court for review of our writ decision. In September of 2000, while the case was pending before the Supreme Court, the trial court went ahead and ordered that reunification services be provided in accordance with our opinion. The court noted "We cannot have, in the best interests of this child, this child sit in limbo while the Supreme Court decides the petition, which may be remanded back to the appellate court, who knows, and it could be anywhere from six months to a year; I have not heard from the California Supreme Court. And so I'm following the Court of Appeals [*sic*], which says, 'provide mother reunification services,' which I intend to do."

Perhaps confounding the expectations of some, Renee has performed quite well under her reunification plan. Although she initially had a positive drug test in November of 2000, and consequently spent a bit more time in jail for the probation violation, her conduct since then has been nearly flawless. Renee participated in a 90-day in-patient drug treatment program upon her release from jail, and reportedly did well. Thereafter, Renee was accepted into a sober living home, The Eleventh Step House. Although Renee made efforts to locate a sober living home which would allow her to have Sayrah with her, she was unable to do so. At its status review hearing in March of 2001, the court found that continued supervision was necessary, that returning Sayrah to Renee would cause a substantial risk of detriment, but that there was a substantial probability that Sayrah would be returned to Renee's custody within six months. The court ordered additional reunification services and set the matter for a status review hearing on October 10, 2001.

Renee continued to improve in her performance under the reunification plan. She was living successfully in the sober living home, regularly drug-testing, attending 12-step meetings, going to drug court, and working part-time. Both her probation officer and the director of her sober living home were effusive in their praise for her efforts. The probation officer stated "[s]he has never submitted a dirty test and never received even minor consequences in the program. She is doing everything so far as we can tell, perfectly. All of the team members have been very impressed." As an example of Renee's newfound sense of responsibility, the sober living home

director related how Renee had been working part-time at Target, which required a three-hour bus ride. Since that distance proved too far to manage without a car, Renee waited until she could obtain another job closer to home, before resigning from Target to continue the new employment. The director stated: "[Renee] is approaching things in a responsible way. . . . [She is] willing to do anything to get her child back."

On August 16, 2001, the Supreme Court reversed our decision. (*Renee J. v. Superior Court, supra,* 26 Cal.4th 735.) In the Supreme Court's view, the language of former subdivision (b)(10) was "ambiguous in the relevant respect and the canons of construction of little assistance in resolving the question . . . ." (*Renee J. v. Superior Court, supra,* 26 Cal.4th at p. 740.) It determined, however, that the Legislature's intent could nonetheless be discerned "[f]rom recent legislative trends toward restricting the circumstances in which reunification services must be provided . . . ." (*Ibid.*) Based upon those "trends," the Supreme Court concluded the Legislature would not have intended the "no reasonable effort" clause to apply to subpart (A) of former subdivision (b)(10). In reaching its conclusion, the Supreme Court expressly acknowledged that its interpretation might be incorrect, and invited the Legislature to clarify the law: "In sum, we interpret the no-reasonable-effort clause as applicable only to subpart (B) of section 361.5, subdivision (b)(10). If we have failed to discern correctly the Legislature's intent in enacting the statute, that body may clarify the statute accordingly." (*Renee J.,* at pp. 748-749, fns. omitted.)

The Legislature did so, with alacrity. Approximately three weeks after the Supreme Court rendered its opinion, the Legislature introduced an amendment to Assembly Bill No. 1695 (2001-2002 Reg. Sess.). That amendment restructured the clauses of subdivision (b)(10), creating a new subparagraph (b)(11), to clarify that the "no reasonable effort" clause *did* apply to both (former) subparts (A) and (B). As explained in an analysis from the Senate Rules Committee, "[i]n current law, a court may choose to not provide reunification services when a parent previously failed to reunify with a sibling of the child in question and when a parent's parental rights have been terminated with a sibling of the child in question. The law also requires a finding that the parent has not made reasonable efforts to treat the problems that led to removal of the sibling. These amendments clarify that the requirement of a finding that the parent had not made reasonable efforts to treat the problems applies to both situations above, failure to reunify and permanent severance of parental rights. [¶] This is being done in response to a State Supreme Court opinion that states that this requirement only applies to cases in which parental rights have been terminated, and also suggests that the Legislature clarify the law. According to the author, it was the intent of

the Legislature that the requirement apply to both situations described above." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1695 (2001-2002 Reg. Sess.) as amended Sept. 7, 2001, pp. 1-2.)

Assembly Bill No. 1695, including the clarification of former subdivision (b)(10), was passed by the Legislature and then signed into law as an urgency measure by Governor Davis on October 10, 2001. It consequently took effect on that date. In an improbable coincidence, that was the very same date the court had scheduled the status review hearing which is at issue in this writ proceeding.

The October 10 hearing, as originally contemplated, has been referred to by the parties as both a 12-month hearing and an 18-month hearing, because it fell roughly 12 months after Renee began her reunification plan, but 18 months after Sayrah was initially detained. However, the court did not actually hold the status review hearing. Instead, the court concluded that in light of the Supreme Court's ruling affirming the initial denial of reunification, it had no choice but to terminate the process without actually conducting the review hearing. "[T]he effect of the Supreme Court's decision is to reverse the Court of Appeals' [*sic*] decision to vacate the disposition findings and to reverse the order of services which follow from the vacating of the disposition because the initial disposition was not to offer services pursuant to [section] 361 [subdivision] (b)(10) and the construction of that language." Based upon that analysis, the court simply terminated the reunification services and scheduled a section 366.26 hearing for January 7, 2002, without actually conducting the review hearing or considering Renee's progress toward reunification.

Because neither the parties nor the court was aware of the amendment of subdivision (b)(10) at the time of the October 10 hearing, it was not discussed. However, when Renee became aware of the amendment, she promptly sought reconsideration of the court's order pursuant to Code of Civil Procedure section 1008.[2] The court scheduled a hearing date of November 6, 2001, for the reconsideration motion, and invited the parties to file further briefing. At the November 6 hearing, the court considered the parties' arguments, and took the matter under submission.

While waiting for the court to issue its decision on the reconsideration motion, Renee petitioned this court for relief. She acknowledged that if the trial court granted the reconsideration and changed its prior ruling, her

---

[2]Renee also included a reference to section 388 in the caption of her motion. However, the points and authorities in support of the motion include no argument based upon section 388, and the trial court ultimately refused to construe it as a section 388 motion.

petition would become moot. However, she explained that with the permanency planning hearing scheduled for January 7, she could not safely wait longer before petitioning for relief.

Ultimately, the court denied the motion for reconsideration. It held that a motion for reconsideration under Code of Civil Procedure section 1008 was not an available remedy in a juvenile dependency proceeding. It also concluded that the Legislature's amendment of subdivision (b)(10) was not retroactive and had no effect on the Supreme Court's decision in the earlier writ proceeding. The court noted, however, that Renee "is not prohibited from filing a section 388 motion to modify the setting of the [section] 366.26 hearing and using the benefit of the reunification services received as the basis of her request to modify."

■ Renee contends that the trial court erred in terminating her reunification services based upon the Supreme Court's decision, because the Legislature's clarification of the statute in question, which was effective on the date the trial court made its order, governed her case. Of course, Renee did not initially raise that issue before the trial court, because the brand new legislation was unknown to any of the participants at the October 10, 2001 hearing. However, Renee did promptly raise the issue before this court, and we have discretion to consider it. ■ " ' "[A] litigant may raise for the first time on appeal a pure question of law which is presented by undisputed facts." . . .' " (*Sanchez v. Truck Ins. Exchange* (1994) 21 Cal.App.4th 1778, 1787 [26 Cal.Rptr.2d 812], quoting *B & P Development Corp. v. City of Saratoga* (1986) 185 Cal.App.3d 949, 959 [230 Cal.Rptr. 192]; see also *People v. Superior Court (Zamudio)* (2000) 23 Cal.4th 183, 195 [96 Cal.Rptr.2d 463, 999 P.2d 686].)

■ In this case, if Renee is correct and the Legislature intended to give the statute retroactive effect, then the legislation applied to this case and the trial court erred in terminating the previously ordered reunification services.

SSA contends that the legislative amendment cannot be construed as retroactive, and thus applicable to this case, because the Legislature did not expressly declare it so.[3] But that is not the standard. In *Western Security Bank v. Superior Court* (1997) 15 Cal.4th 232 [62 Cal.Rptr.2d 243, 933 P.2d

---

[3]Sayrah's de facto parents, Kenneth and Connie J., assert that the legislation actually states "in the body thereof" that it is not retroactive. However, in support of that claim, they cite not to the legislation itself, but to the entirety of the Senate Rules Committee analysis. Our own review of that five-page document, as well as the legislation itself, revealed no such statement. In any event, as we explain, the issue is not retroactivity, per se. Instead, our focus has to be on whether the legislature intended its amendment of the statute to effect a change in the prior law, or merely to clarify that law.

507], the Supreme Court addressed the effect of a statutory amendment, under circumstances very similar to those presented here.

In *Western Security Bank*, the Court of Appeal had interpreted anti-deficiency laws as prohibiting enforcement of standby letters of credit given as additional security in a real estate transaction. Immediately thereafter, and while the case was pending before the Supreme Court, the Legislature acted to amend the laws and make clear that enforcement of a letter of credit did not run afoul of the antideficiency laws. The Supreme Court then remanded the case to the Court of Appeal with directions to vacate its prior decision and reconsider the cause. On reconsideration, the Court of Appeal reaffirmed its prior decision, concluding that the new legislation represented a substantial change in the law which was not entitled to retroactive effect. Our Supreme Court then reversed the Court of Appeal. Its analysis was thorough, and we will quote it at length.

■ "A basic canon of statutory interpretation is that statutes do not operate retrospectively unless the Legislature plainly intended them to do so. [Citations.] A statute has retrospective effect when it substantially changes the legal consequences of past events. [Citation.] A statute does not operate retrospectively simply because its application depends on facts or conditions existing before its enactment. [Citation.] Of course, when the Legislature clearly intends a statute to operate retrospectively, we are obliged to carry out that intent unless due process considerations prevent us. [Citation.] [¶] ■ A corollary to these rules is that a statute that merely *clarifies*, rather than changes, existing law does not operate retrospectively even if applied to transactions predating its enactment. We assume the Legislature amends a statute for a purpose, but that purpose need not necessarily be to change the law. [Citation.] Our consideration of the surrounding circumstances can indicate that the Legislature made material changes in statutory language in an effort only to clarify a statute's true meaning. [Citations.] Such a legislative act has no retrospective effect because the true meaning of the statute remains the same. [Citations.] [¶] One such circumstance is when the Legislature promptly reacts to the emergence of a novel question of statutory interpretation: ' "An amendment which in effect construes and clarifies a prior statute must be accepted as the legislative declaration of the meaning of the original act, where the amendment was adopted soon after the controversy arose concerning the proper interpretation of the statute. . . . [¶] If the amendment was enacted soon after controversies arose as to the interpretation of the original act, it is logical to regard the amendment as a legislative interpretation of the original act—a formal change—rebutting the presumption of substantial change." [Citation.]' [Citation.] [¶] Even so, a legislative declaration of an existing statute's meaning is neither binding nor

conclusive in construing the statute. Ultimately, the interpretation of a statute is an exercise of the judicial power the Constitution assigns to the courts. [Citations.] Indeed, there is little logic and some incongruity in the notion that one Legislature may speak authoritatively on the intent of an earlier Legislature's enactment when a gulf of decades separates the two bodies. [Citation.] Nevertheless, the Legislature's expressed views on the prior import of its statutes are entitled to due consideration, and we cannot disregard them. [¶] ■ '[A] subsequent expression of the Legislature as to the intent of the prior statute, although not binding on the court, may properly be used in determining the effect of a prior act.' [Citation.] Moreover, even if the court does not accept the Legislature's assurance that an unmistakable change in the law is merely a 'clarification,' the declaration of intent may still effectively reflect the Legislature's purpose to achieve a retrospective change. [Citation.] Whether a statute should apply retrospectively or only prospectively is, in the first instance, a policy question for the legislative body enacting the statute. [Citation.] Thus, where a statute provides that it clarifies or declares existing law, '[i]t is obvious that such a provision is indicative of a legislative intent that the amendment apply to all existing causes of action from the date of its enactment. In accordance with the general rules of statutory construction, we must give effect to this intention unless there is some constitutional objection thereto.' [Citations.]" (*Western Security Bank v. Superior Court, supra*, 15 Cal.4th at pp. 243-245, fn. omitted.)

■ Here, as in *Western Security Bank*, the Legislature acted swiftly to clarify an existing law in the wake of court interpretation. It did so at the express invitation of the Supreme Court, which declared the prior law to be ambiguous. Moreover, the Legislature indicated (in an analysis prepared in the Senate Rules Committee when the amendment was introduced), that its intent was merely to "clarify" the existing law. The analysis further stated that, according to the author, "it *was* the intent of the Legislature that the [no reasonable effort] requirement apply to both situations . . . ." (Sen. Rules Com., Off. of Sen. Floor Analyses, 3d reading analysis of Assem. Bill No. 1695 (2001-2002 Reg. Sess.) as amended Sept. 7, 2001, p. 2, italics added.) These facts indicate that it was the intent of the Legislature to give its clarification retroactive effect.

In *In re Marriage of Petropoulos* (2001) 91 Cal.App.4th 161 [110 Cal.Rptr.2d 111], the court relied upon a statement of the Senate Rules Committee in concluding that the Legislature had intended its amendment of the statute in question to be retroactive. In that case, the Legislature had enacted Family Code section 3653, subdivision (c), effective in 1999, explicitly prohibiting the reimbursement of spousal support overpayments.

Then, effective in 2000, the Legislature amended the subdivision to provide exactly the opposite, i.e., that spousal support overpayments *were* recoverable. A dispute arose as to whether the 2000 legislation was intended to be retroactive, and allow recovery of overpayments which would otherwise be governed by the 1999 law.

The Court of Appeal held that it was. In doing so, the court relied specifically on a statement of the Senate Rules Committee: "According to the Senate Rules Committee, those amendments would 'allow the court to . . . order the support obligee to repay any amounts paid by the obligor in excess of the modified order. This amendment is necessary to fix a mistake from a bill that was enacted last year.' . . . [¶] The Legislature's acknowledgement that the latest amendment was needed 'to address a concern' and 'to fix a mistake' suggests that it intended retroactive application." (*In re Marriage of Petropoulos, supra,* 91 Cal.App.4th 161, 172, italics omitted.)

As in *In re Marriage of Petropoulos*, we have a clear statement, by the Senate Rules Committee, explaining that the amendment of the statute is necessary merely to rectify a perceived problem with the prior version, and not the product of any desire to take the law in a new direction.

Finally, *City of Redlands v. Sorensen* (1985) 176 Cal.App.3d 202 [221 Cal.Rptr. 728], is also instructive. In that case, the Court of Appeal determined that the Legislature's amendment of Civil Code section 1714.9, subdivision (a)(2), which qualifies the firefighter's rule by permitting tort recovery in specified circumstances, was retroactive, as it merely clarified longstanding exceptions to application of the firefighter's rule. The Court of Appeal reached that conclusion despite the fact that the Supreme Court had previously construed the firefighter's rule in a contrary fashion. (*Hubbard v. Boelt* (1980) 28 Cal.3d 480 [169 Cal.Rptr. 706, 620 P.2d 156].)

In *City of Redlands*, as in this case, the Legislature's decision to amend the statute was a direct response to the Supreme Court's opinion. The Court of Appeal explained that notwithstanding the Supreme Court's decision, it is "well established that the enactment of a statute or an amendment to a statute for the purpose of clarifying preexisting law or making express the original legislative intent is not considered a change in the law; in legal theory it simply states the law as it was all the time, and no question of retroactive application is involved. [¶] . . . [¶] That is precisely the situation here. Subdivision (b) of Labor Code section 3852 enacted in 1982 as part of an urgency measure and later further clarified, modified and incorporated in Civil Code section 1714.9 simply clarified that the fireman's rule does not preclude recovery in a proper case where injury is caused the fireman or

policeman by an independent act of misconduct after his or her presence at the scene is known or should have been known. This does not represent a change in the law. As previously indicated, a longstanding exception to application of the fireman's rule applies where the injury was caused by an act of misconduct independent of the conduct that necessitated the officer's or fireman's presence on the scene. (E.g., *Lipson* v. *Superior Court* [(1982)] 31 Cal.3d 362 [182 Cal.Rptr. 629, 644 P.2d 822]; *Malo* v. *Willis* [(1981)] 126 Cal.App.3d 543 [178 Cal.Rptr. 774]; see *Hubbard* v. *Boelt, supra,* 28 Cal.3d 480, 486.)" (*City of Redlands v. Sorensen, supra,* 176 Cal.App.3d at pp. 211-212.)

As in *City of Redlands,* there has been no change in the law. According to the Supreme Court's own analysis, former subdivision (b)(10) was ambiguous as previously written. The court ascribed a meaning to it, but only by attempting to discern what policies the Legislature would have been most concerned about in enacting it. Moreover the court specifically invited the Legislature to "clarify" it. Under these circumstances, we have no choice but to conclude that the Legislature intended to do just that: *clarify.*

Consequently, the Legislature's *clarification* of subdivision (b)(10) is properly applied to all open cases, including this one. Renee was actually in the midst of her reunification plan when the new legislation was enacted. As such, the new legislation should have been applied, and properly overrode the effect of the Supreme Court's decision, which would otherwise have been law of the case. ■ "The doctrine of law of the case of course is not inflexible. [Citation.] The principal ground for ignoring the doctrine . . . is an intervening or contemporaneous change in the law . . . ." (*Davies v. Krasna* (1975) 14 Cal.3d 502, 507, fn. 5 [121 Cal.Rptr. 705, 535 P.2d 1161, 79 A.L.R.3d 807]; see also *People ex rel. Dept. Pub. Wks. v. Lagiss* (1963) 223 Cal.App.2d 23, 35 [35 Cal.Rptr. 554] ["The clarification of the principles stated in *Chevalier* on the issue of public necessity made after our decision in *People v. Lagiss,* impels us to depart from the doctrine of 'the law of the case' because adherence thereto would amount to the use of the doctrine, as an instrument of injustice upon plaintiff. Accordingly, we do not hesitate to reconsider our prior determination in the light of the controlling rule stated in the *Chevalier* case."].)

■ Respondents urge us to conclude that even assuming the amendment of subdivision (b)(10) is retroactive, and would properly apply to this case, the trial court's error in failing to apply it was harmless, for two reasons. First, SSA argues that Renee's initially spotty performance, including some drug use, in the early phases of this dependency, reveals that she had not actually taken reasonable steps to treat her drug problem prior to the

first dispositional hearing. Thus, SSA contends Renee would not have been entitled to reunification services at that hearing under any interpretation of former subdivision (b)(10). We cannot agree. Section 361.5 authorizes, but *does not require*, the court to deny services in the specified circumstances. Even if the court had sufficient evidence to conclude that Renee's efforts to address her drug problem were insufficient to that point, it could nonetheless have focused on the fact she had made significant changes in her lifestyle since the removal of her other children, and determined that further efforts to deal with the problem would not have been "fruitless." (See *Deborah S. v. Superior Court* (1996) 43 Cal.App.4th 741, 750 [50 Cal.Rptr.2d 858] [explaining that the exceptions to reunification found in § 361.5, subd. (b), reflect a recognition by the Legislature that "it may be fruitless to provide reunification services under certain circumstances"].)

It should (but cannot) go without saying that "fruitless" is a pretty high standard. If the evidence suggests that despite a parent's substantial history of misconduct with prior children, there is a reasonable basis to conclude that the relationship with the current child could be saved, the courts should always attempt to do so. ■ Courts must keep in mind that "[f]amily preservation, with the attendant reunification plan and reunification services, is the first priority when child dependency proceedings are commenced." (*In re Elizabeth R.* (1995) 35 Cal.App.4th 1774, 1787 [42 Cal.Rptr.2d 200].) The failure of a parent to reunify with a prior child should never cause the court to reflexively deny that parent a meaningful chance to do so in a later case. To the contrary, the primary focus of the trial court must be to *save* troubled families, not merely to expedite the creation of what it might view as better ones.

■ Additionally, we note that the "reasonable effort to treat" standard found in former subdivision (b)(10) (now subd. (b)(10) and (11)) is not synonymous with "cure." The mere fact that Renee had not entirely abolished her drug problem would not preclude the court from determining that she had made reasonable efforts to treat it. And finally, we would, in any event, reject SSA's implicit suggestion that it would be proper to engage in *selective* hindsight. If we were to agree that Renee's conduct after the first dispositional hearing should be considered in determining whether, in retrospect, the court would have been justified in denying her services, we would have to consider *all* of her conduct. And it has been, overall, remarkably good. In fact, contrary to SSA's argument, Renee's efforts and progress in rehabilitation suggest that this is a case which SSA might have been too eager, and the court too willing, to label "fruitless."

In its second harmless error argument, SSA contends the court's refusal to conduct the 18-month hearing was harmless because even if the hearing had

been held, the court would have had no option but to terminate reunification services and schedule a permanency planning hearing. According to this theory, the court had no other option because section 366.22 prohibits the extension of reunification services beyond 18 months from the initial detention, and Renee was admittedly unable to take custody of Sayrah in her sober living home.[4] Since the effect of the court's order here was the same, the fact that it may have been made for the wrong reason is assertedly of no moment.

We decline SSA's invitation to anticipate, or dictate, how the court would have ruled had it allowed the reunification process to reach a normal conclusion. The whole point of Renee's petition is that she was entitled to have the process proceed to that conclusion, with the appropriate findings and orders. As explained in *In re James Q.* (2000) 81 Cal.App.4th 255, 263 [96 Cal.Rptr.2d 595], review hearings represent one of the " '[s]ignificant safeguards . . . built into the current dependency scheme.' " (Quoting *In re Marilyn H.* (1993) 5 Cal.4th 295, 307, 308 [19 Cal.Rptr.2d 544, 851 P.2d 826].) Thus, even assuming, as respondents contend, that the conclusion were necessarily a "slam dunk," we would still be reluctant to dispose of the hearing itself, and we could not imagine any real objection to our passing the ball back to the trial court to complete that play.

But we would not agree that the outcome of the hearing is a slam dunk. Several appellate courts, beginning with *In re Elizabeth R., supra,* 35 Cal.App.4th at pages 1789-1796, have concluded that trial courts have discretion to continue reunification services past the 18-month date, if it appears the services offered have been defective in some way. ■ As explained in *Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996, 1016-1017 [70 Cal.Rptr.2d 603], "Courts of Appeal have held the Legislature never intended a strict enforcement of the 18-month limit to override all other concerns including preservation of the family when appropriate. (*In re David D.* (1994) 28 Cal.App.4th 941, 955-956 [33 Cal.Rptr.2d 861]; *In re Daniel G.* (1994) 25 Cal.App.4th 1205, 1214 [31 Cal.Rptr.2d 75]; *In re Dino E.* [(1992)] 6 Cal.App.4th [1768,] 1778 [8 Cal.Rptr.2d 416].) The Courts of Appeal have held the answer to the present dilemma is found in section 352, which authorizes a continuance of *any* hearing upon a showing of good

---

[4]Section 366.22 provides in pertinent part: "When a case has been continued pursuant to paragraph (1) of subdivision (g) of Section 366.21, the permanency review hearing shall occur within 18 months after the date the child was originally removed from the physical custody of his or her parent or legal guardian. The court shall order the return of the child to the physical custody of his or her parent or legal guardian unless the court finds, by a preponderance of the evidence, that the return of the child to his or her parent or legal guardian would create a substantial risk of detriment to the safety, protection, or physical or emotional well-being of the child."

cause. Section 352 states: 'Upon request of counsel . . . the court may continue any hearing under this chapter beyond the time limit within which the hearing is otherwise required to be held, provided that no continuance shall be granted that is contrary to the interest of the minor. In considering the minor's interests, the court shall give substantial weight to a minor's need for prompt resolution of his or her custody status, the need to provide children with stable environments, and the damage to a minor of prolonged temporary placements. [¶] Continuances shall be granted only upon a showing of good cause and only for that period of time shown to be necessary by the evidence presented at the hearing on the motion for the continuance. . . .' (§ 352.) A juvenile court has discretion to continue an 18-month hearing pursuant to section 352 when, as here, no reasonable reunification services have ever been offered or provided to a parent. (*In re Elizabeth R., supra,* 35 Cal.App.4th at pp. 1797-1799 [parent hospitalized for mental illness for most of the reunification period and had substantially complied with reunification plan]; *In re Dino E., supra,* 6 Cal.App.4th at p. 1778 [no reunification plan was ever developed for the father].) The juvenile court may do so on its own motion. (*In re Elizabeth R., supra,* 35 Cal.App.4th at p. 1798; *In re Dino E., supra,* 6 Cal.App.4th at p. 1779.) In exercising its discretion, the juvenile court should consider: the failure to offer or provide reasonable reunification services; the likelihood of success of further reunification services; whether [the child's] need for a prompt resolution of her dependency status outweighs any benefit from further reunification services; and any other relevant factors the parties may bring to the court's attention." (Fn. omitted.)

 Here, Renee was offered no reunification services at all during the initial six months of the dependency. Add to that her apparently remarkable progress once her reunification plan was offered, plus the fact that Sayrah's stable placement with family members is unlikely to be adversely affected by a continuance, and we think a compelling argument could be made in favor of extending the 18-month hearing. Of course, there are always other factors which militate against such a continuance, and we do not mean to suggest that the court would be obligated to grant it—only that the court should consider it.

The petition for extraordinary relief is granted. The juvenile court is ordered to vacate its order terminating reunification services and setting the matter for a section 366.26 permanency hearing. The court shall hold the hearing originally scheduled for October 10, 2001. At that hearing it shall consider, among other things, whether it should continue the 18-month

hearing pursuant to section 352, and offer additional reunification services to Renee.

Bedsworth, J., and O'Leary, J., concurred.

The petition of real parties in interest for review by the Supreme Court was denied June 12, 2002.