Filed 6/27/14  Ericka M. v. Superior Court CA2/3
Opinion following rehearing

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ERICKA M., | B254630 |
| Petitioner, | (Los Angeles County Super. Ct. No. CK83086) |
| v. | |
| THE SUPERIOR COURT OF LOS ANGELES COUNTY, | |
| Respondent; | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS; petition for extraordinary writ. Anthony Trendacosta, Referee.  Petition granted in part, denied in part.

Law Offices of Timothy Martella, Rebecca Harkness and Etchu Tasinga for Petitioner.

No Appearance for Respondent.

John F. Krattli, County Counsel, Dawyn Harrison, Assistant County Counsel, and Kimberly A. Roura, Deputy County Counsel, for Real Party in Interest.

_____

**INTRODUCTION**

Ericka M. (mother) challenges a juvenile court order denying family reunification services and setting a Welfare and Institutions Code[1] section 366.26 permanent plan hearing in her infant son Emery's dependency case. The juvenile court denied reunification services pursuant to section 361.5, subdivision (b)(11) based on mother's failure to reunify with her two older children. In her petition for extraordinary writ relief, mother contends the evidence was insufficient to support the juvenile court's requisite finding that she failed to make subsequent reasonable efforts to address the untreated mental health conditions that led to the termination of parental rights with respect to her older children. Mother also challenges the juvenile court's jurisdiction and disposition orders.

At the time of the disposition hearing, the undisputed evidence established that mother had remained compliant with her prescribed mental health regimen since the inception of Emery's dependency case. We therefore conclude the juvenile court's finding that mother failed to make reasonable efforts was erroneous, and grant the petition insofar as it concerns the denial of reunification services. The juvenile court is directed to conduct another disposition hearing to determine the appropriate family reunification services to be provided to mother and Emery. The petition is denied insofar as it challenges the jurisdiction and disposition orders.

**FACTS AND PROCEDURAL BACKGROUND**

Mother and her children first came to the attention of the Los Angeles Department of Children and Family Services (the Department) in June 2010, when her oldest son, Derick, was a year old. In September 2010, the juvenile court sustained a dependency petition on behalf of Derick on findings that mother left the child in an abandoned home with unrelated adults and failed to take prescribed psychotropic medications to treat a diagnosed mental health condition.

---

[1] All subsequent statutory references are to the Welfare and Institutions Code.

While Derick's dependency case was pending, mother's second child, J., was born in January 2011. In March 2011, the Department filed a dependency petition on behalf of J., alleging caretaker neglect. The juvenile court sustained the petition in November 2011, finding again that mother had untreated mental and emotional disorders that placed the child at risk of physical and emotional harm.

Mother failed to reunify with Derick and J., and her parental rights were terminated as to both children on July 23, 2013.

Emery was born less than a month later, in August 2013. Because there were signs of jaundice, the hospital ordered additional blood testing for the infant. A hospital social worker reported mother and Emery's presumed father seemed overly eager to leave the hospital, which caused concern among the hospital staff. In an interview with the social worker, mother admitted she had a prior dependency case involving her two older children, which resulted in the termination of her parental rights. After all tests for Emery came back clear, the infant was released to his parents.

The Department interviewed mother following her release from the hospital. Mother admitted she had been diagnosed with bipolar disorder, and stopped taking her prescribed medication around the time that Derick was removed from her custody. She then became pregnant with J., and remained off the medication because she did not want it to affect the baby.

Mother acknowledged her parental rights had been terminated as to her two older children and pledged to do everything possible to ensure Emery remained in her custody. Though she claimed to feel "fine" without medication, mother agreed to get assessed by a mental health professional as soon as possible. Mother also agreed to a safety plan that provided father would be Emery's primary caregiver and prohibited mother from being unsupervised with the child until she was cleared by a mental health professional. Mother reported she and father lived with her aunt, who had a crib for Emery.

3

On August 23, 2013, within a week of Emery's birth, mother delivered a sealed letter to the Department from Kedren Acute Psychiatric Hospital and Community Mental Health Center (Kedren) confirming mother had been seen for an assessment and evaluation earlier that day. The letter also stated that mother scheduled two more appointments for treatment with Kedren.

On September 5, 2013, the Department held a Team Decision Meeting with mother. Mother reported that father had been arrested and was in jail. As father could no longer care for Emery, mother agreed to have Emery placed with her aunt, Rochelle B., until mother began mental health services. Mother was allowed to have unlimited visitation with Emery, as long as Rochelle was present, and Rochelle reported that mother visited Emery every other day.

On October 9, 2013, the Department filed a dependency petition on behalf of Emery, alleging mother had been diagnosed with bipolar disorder and had failed to take prescribed psychotropic medication or regularly participate in mental health services, which rendered mother incapable of providing regular care and supervision to Emery. The petition also alleged that mother's parental rights had been terminated as to her older children due to her mental and emotional problems.

The juvenile court found a prima facie case had been established and ordered Emery to remain detained in Rochelle's custody. The court also ordered mother to continue with her mental healthy therapy and to follow her therapist's instructions.

On November 19, 2013, a dependency investigator interviewed mother in advance of the jurisdiction and disposition hearing. Mother stated she was diagnosed with bipolar disorder at age 14, and had been taking daily medication and receiving weekly services at Kedren since the diagnosis. She claimed she stopped taking medication and receiving therapy when she became pregnant with her oldest child, and it was only after Emery's birth that she recommenced her treatment. Mother reported, " 'Since the judge told me to receive mental health services I've been taking my meds and [going to Kedren] . . . . Besides medication I am seeing a doctor. I see a therapist too.' " Mother's mental health provider confirmed mother was compliant with her prescribed treatment.

4

With respect to her older children, mother said the social worker " 'had eyes for my kids' " and initiated the prior dependency case to have the children taken away from her. She maintained " 'there was no reason to take my other two kids or [Emery] now,' " but said " 'I am still going to comply either way it goes.' "

The Department's Multidisciplinary Assessment Team (MAT) reported that mother was committed to "get[ting] her life focused" and "complying with the court orders." The MAT also reported that Emery was doing well in Rochelle's home and mother's visits with Emery were appropriate and nurturing. The MAT concluded Rochelle would be able to support mother and Emery during the dependency case "due to their strong bond with one another."

In its jurisdiction and disposition report, the Department maintained mother's bipolar disorder posed a significant risk to Emery's health and well-being. According to the Department's assessment, mother was complying with the mental health plan only " 'because the Judge said so.' " The Department concluded mother was unaware of why her other children were taken from her and that it "appears" mother is only in compliance with her mental health treatment because it is "[c]ourt ordered." On this basis, the Department recommended Emery's continued detention and opposed reunification services for mother.

On January 23, 2014, the Department submitted a last minute information statement, reporting that (1) mother continued to take her medication and receive appropriate mental health treatment; (2) she still was not living in a suitable home for a child; and (3) Rochelle was willing to allow mother to live in her home with Emery until mother could find suitable housing.

5

On January 24, 2014, the juvenile court held a joint adjudication and disposition hearing. The court sustained the jurisdictional allegations, noting the juvenile court in the prior dependency case had already concluded mother's "mental condition placed the [older] children at risk" and mother was unable to articulate why Emery would not be "at the same risk or in the same situation as were the older two children." The court observed that mother "has really not made any progress" and "this has been an ongoing problem with [mother], [in] that she complies for a while, then she doesn't comply . . . ." The court concluded this "kind of cyclical nature of her compliance, making progress and then falling back, is a consistent pattern," and indicated "from a preponderance standard" that the jurisdictional allegations were true. Having declared Emery a dependent, the court also found the infant would be in substantial danger if returned to mother, and no reasonable means existed to protect him without removal.

Finally, the court denied reunification services and set a permanent plan hearing pursuant to section 366.26. With respect to the denial of reunification services, the court found mother's parental rights had been terminated as to her two older children and she had since failed to make "substantive progress in her treatment."

Mother filed a writ petition challenging the order denying reunification services and setting the section 366.26 hearing. We stayed the section 366.26 hearing and issued an order to show cause.

## DISCUSSION

1.     *The Juvenile Court Erred in Denying Reunification Services*

"There is a presumption in dependency cases that parents will receive reunification services. [Citation.] Section 361.5, subdivision (a) directs the juvenile court to order services *whenever* a child is removed from the custody of his or her parent *unless* the case is within the enumerated exceptions in section 361.5 subdivision (b)." (*Cheryl P. v. Superior Court* (2006) 139 Cal.App.4th 87, 95 (*Cheryl P.*).) We review an order denying reunification services for substantial evidence. (*Id.* at p. 96.)

Section 361.5, subdivision (b)(11) provides: "Reunification services need not be provided to a parent or guardian described in this subdivision when the court finds, by clear and convincing evidence, any of the following: [¶] . . . [¶] (11) That the parental rights of a parent over any sibling or half sibling of the child had been permanently severed . . . and that, according to the findings of the court, this parent has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from the parent." Thus, there are two requirements for applying the exception: (1) the parental rights over a sibling have been permanently terminated; *and* (2) the parent failed to make *reasonable efforts* to correct the problem that led to the termination of parental rights. (See *Cheryl P., supra,* 139 Cal.App.4th at p. 96.)

" 'The inclusion of the "no-reasonable effort" clause in [section 361.5, subdivision (b)(11)] provides a means of mitigating an otherwise harsh rule that would allow the court to deny services simply on a finding that services had been terminated as to an earlier child when the parent had in fact, in the meantime, worked toward correcting the underlying problems.' " (*In re Albert T.* (2006) 144 Cal.App.4th 207, 218.) "If the evidence suggests that despite a parent's substantial history of misconduct with prior children, there is a reasonable basis to conclude that the relationship with the current child could be saved, the courts should always attempt to do so." (*Renee J. v. Superior Court* (2002) 96 Cal.App.4th 1450, 1464 (*Renee J.*).) As the court explained in *Renee J.*, "[c]ourts must keep in mind that '[f]amily preservation, with the attendant reunification plan and reunification services, is the first priority when child dependency proceedings are commenced.' [Citation.] The failure of a parent to reunify with a prior child should never cause the court to reflexively deny that parent a meaningful chance to do so in a later case. To the contrary, the primary focus of the trial court must be to save troubled families, not merely to expedite the creation of what it might view as better ones." (*Ibid.*)

7

"[T]he 'reasonable effort to treat' standard . . . is not synonymous with 'cure.' " (*Renee J., supra,* 96 Cal.App.4th at p. 1464.) Rather, the "requirement focuses on the extent of a parent's efforts, not whether he or she has attained 'a certain level of progress.' [Citation.]" (*R.T. v. Superior Court* (2012) 202 Cal.App.4th 908, 914.) "By focusing on [a parent's] lack of sufficient progress" toward curing the problem that led to a sibling's removal, the juvenile court fails to apply the appropriate standard under the "reasonable effort" prong. (*Cheryl P., supra,* 139 Cal.App.4th at p. 97; see also *Renee J.,* at p. 1464 [observing "[t]he mere fact that [the mother] had not entirely abolished her drug problem would not preclude the court from determining that she had made reasonable efforts to treat it"].)

Here, the juvenile court applied the wrong standard. By focusing on what it characterized as the "kind of cyclical nature of [mother's] compliance" in the prior dependency case and whether she had made "substantive progress in her treatment," the court failed to consider whether mother's subsequent conduct constituted "reasonable efforts" to correct the problems that led to the removal of her older children. Notwithstanding the outcome of the prior dependency case, the undisputed evidence in this case is that mother sought mental health treatment less than a week after Emery's birth, she saw a doctor, obtained new prescriptions, and was following her medication regimen. Mother's mental health provider and the Department's own reports confirmed that, since Emery's detention, mother had maintained consistent compliance with her prescribed mental health treatment, and had committed herself to "get[ting] her life focused" and "complying with the court orders."

As we shall explain, mother's "pattern" of "making progress and then falling back" was relevant to the juvenile court's assessment of whether continued dependency supervision was necessary. However, standing alone, this finding was not sufficient to deny mother reunification services for Emery. (See *Cheryl P., supra,* 139 Cal.App.4th at p. 98 [although parents had been "recalcitrant at times about services" in older son's dependency case, their substantial compliance with case plan precluded denial of reunification services in younger son's case].) At the time of the disposition hearing, the

8

undisputed evidence was that mother had consistently complied with the Department's case plan, she had not fallen back, and she had made reasonable and earnest efforts to address the mental health issues that led to the termination of her parental rights in the prior case. To be sure, if mother is to ultimately reunify with Emery, she will need to break the pattern of non-compliance that led to the removal of her older children; but she must be given the opportunity to do so. (See *Renee J., supra,* 96 Cal.App.4th at p. 1464 ["If the evidence suggests . . . there is a reasonable basis to conclude that the relationship with the current child could be saved, the courts should always attempt to do so"].) In view of mother's undisputed compliance in Emery's case thus far, the juvenile court's order denying reunification services was not supported by substantial evidence.

    2.    *Substantial Evidence Supports the Jurisdiction and Disposition Findings*

Based on the findings made in the older children's dependency case, the juvenile court determined that mother's untreated bipolar condition posed a significant risk to Emery's safety, requiring continued dependency supervision and removal of the infant from mother's physical custody. Mother contends the evidence was insufficient to support the court's jurisdiction and disposition findings because she had maintained compliance with her prescribed mental health regimen since Emery's detention. We disagree.

We review a juvenile court's jurisdiction and disposition findings for substantial evidence. (*In re Heather A.* (1996) 52 Cal.App.4th 183, 193; *In re Amos L.* (1981) 124 Cal.App.3d 1031, 1038.) As we alluded to above, though mother's conduct in the former dependency case does not alone sanction the denial of reunification services in view of mother's current efforts to address her mental health issues, the juvenile court could properly consider mother's prior pattern of non-compliance in determining her untreated condition posed a substantial risk to Emery under section 300, subdivision (j).[2]

---

[2]     Section 300, subdivision (j) provides for dependency jurisdiction where there is evidence that "[t]he child's sibling has been abused or neglected, as defined in subdivision (a), (b), (d), (e), or (i), and there is a substantial risk that the child will be abused or neglected, as defined in those subdivisions."

9

A substantial risk of current physical harm can be established by past misconduct where the evidence shows it is "reasonably likely the misconduct will reoccur." (*In re Y.G.* (2009) 175 Cal.App.4th 109, 116.) Here, as the juvenile court found, the prior dependency case evidenced a "consistent pattern" in which mother made progress with her mental health treatment, then fell back into non-compliance. This pattern ultimately resulted in the termination of mother's parental rights over her two older children due to mother's inability to address the risk engendered by her untreated bipolar condition. Moreover, mother told the Department investigator that she was currently complying with her prescribed mental health plan " 'because the Judge said so.' " We are hopeful that, with persistent treatment and counseling, mother will learn to perceive the danger that her untreated condition poses to Emery, without the need for court supervision and dependency services. However, in view of mother's history of non-compliance, substantial evidence supports the conclusion that dependency jurisdiction is currently necessary to ensure Emery is protected against a reasonable—but not certain—likelihood that mother's past misconduct will reoccur.

With respect to the disposition order, in addition to the foregoing evidence, mother admitted that her current living situation would not be suitable for an infant. The Department investigators also observed that mother relied heavily on her aunt Rochelle for support in caring for Emery, and that Rochelle had been Emery's primary caretaker for much of his young life. Taken together with mother's history in her older children's dependency case, the evidence was sufficient to find Emery would be in substantial danger if returned to mother's physical custody, and no reasonable means existed to protect him without removal. (§ 361, subd. (c)(1).)

## DISPOSITION

The petition is granted in part and denied in part. Let a writ issue directing the juvenile court to (1) vacate its order denying mother reunification services and setting the matter for a section 366.26 hearing, and (2) conduct a new disposition hearing to determine the appropriate family reunification services to be provided to mother and Emery.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

KITCHING, J.

We concur:

KLEIN, P. J.

CROSKEY, J.

11