Filed 3/15/16  J.M. v. Superior Court CA4/2

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FOURTH APPELLATE DISTRICT**

**DIVISION TWO**

| | |
|---|---|
| J.M., | |
| Petitioner, | E064991 |
| v. | (Super.Ct.Nos. J261935, J261936) |
| THE SUPERIOR COURT OF SAN BERNARDINO COUNTY, | OPINION |
| Respondent; | |
| SAN BERNARDINO COUNTY CHILDREN AND FAMILY SERVICES, | |
| Real Party in Interest. | |

ORIGINAL PROCEEDINGS; petition for extraordinary writ.  Steven A. Mapes, Judge.  Petition denied.

Friedman Gebbie Cazares & Gilleece and Stacey Wolcott for Petitioner.

No appearance for Respondent.

1

Jean-Rene Basle, County Counsel, Jamila Bayati, Deputy County Counsel, for

Real Party in Interest.

Petitioner J.M. (mother) filed a petition for extraordinary writ pursuant to

California Rules of Court, rule 8.452 challenging the juvenile court's order terminating

reunification services as to her children, E.V. and C.V. (the children) and setting a

Welfare and Institutions Code[1] section 366.26 hearing.  Mother argues that the juvenile

court erred in denying her reunification services under section 361.5.  Mother also

requests a stay of the section 366.26 hearing, pending the granting or denial of this writ

petition.  We deny the writ petition and the request for a stay.

FACTUAL AND PROCEDURAL BACKGROUND

On September 4, 2015, the San Bernardino County Department of Children and

Family Services (CFS) filed a petition on behalf of the children.  E.V. was three years old

at the time, and C.V. was four.  The petition alleged that the children came within section

300, subdivisions (b) (failure to protect), (g) (no provision for support), and (j) (abuse of

sibling).  Specifically, the petition alleged that mother and the children's alleged father

(father)[2] had substance abuse problems that interfered with their ability to parent.  The

petition further alleged that mother exposed the children to marijuana and cannabis

extracting chemicals that she kept in the home, within their reach, and that father knew or

---

[1]  All further statutory references will be to the Welfare and Institutions Code, unless otherwise noted.

[2]  Father is not a party to this writ.

2

reasonably should have known that the children were at risk of abuse and/or neglect if left in her care. The petition also alleged that mother was currently incarcerated and unable to make arrangements for the care of the children, and that father's whereabouts were unknown. In addition, the petition alleged that mother and father received reunification services for the children's half-siblings, T.V., S.V., N.V., and J.V., but failed to reunify. Their reunification services were terminated, and their parental rights were terminated on December 14, 2010. Those four children were subsequently adopted.

The social worker filed a detention report on or around September 8, 2015. The social worker reported that a police officer went to mother's home with a probation officer to do a probation check on mother's boyfriend, J.M. He was not home, but they conducted a probation search of the home and found marijuana and extracted cannabis in a drawer that was within reach of the children. They also found chemicals that were consistent with those used to extract cannabis. There were several mason jars full of marijuana and about 110 small containers of extracted cannabis. Mother was arrested for child endangerment and drug sales. The social worker spoke with mother, who denied that the chemicals were within reach of the children, since they were downstairs, and the children did not go downstairs.

The court held a detention hearing on September 8, 2015, and detained the children in foster care.

*Jurisdiction/Disposition Report and Hearing*

The social worker filed a jurisdiction/disposition report on September 25, 2015, recommending that mother not be provided with reunification services and that a section 366.26 hearing be set. The social worker reported on mother's and father's previous dependencies. A section 300 petition was filed in Ventura County on June 26, 2009, with regard to their children, N.V., S.V., and T.V. Then, on January 7, 2010, a petition was filed on behalf of their child, J.V. The petitions included the allegations that mother had a significant history of substance abuse, and father had histories of alcohol abuse and violent and aggressive behavior. The petitions also alleged that mother and father had failed to provide appropriate care and supervision and had a history of unstable housing. Mother and father received 12 months of reunification services, but failed to progress. The court terminated services and set a section 366.26 hearing. Parental rights were terminated on December 14, 2010, and the four children were adopted on June 27, 2011.

Then, in December 2010, mother had a fifth child, C.V., in Los Angeles County. He was taken into protective custody a few days after birth. A jurisdiction/disposition hearing was held on February 4, 2011, and C.V. was returned to mother under a plan of family maintenance. By the time of the six-month review hearing on January 24, 2012, mother completed her family maintenance services, and the case was closed.

The social worker interviewed mother on September 14, 2015, regarding the current allegations. Mother said she began using methamphetamine when she was 13 years old, but stopped when she was 18. She admitted currently using marijuana for pain,

4

as she said she tested positive for "pre-cervical cancer."  She reported that she was living with her boyfriend, J.M., before, but he no longer lived with her.  He was arrested a year ago, and she believed that maybe some of the jars of marijuana and extraction tools found in her home were "left over from that time."  Mother admitted that the marijuana found in her bedroom was hers, though.  When asked about domestic violence, mother said that father used to hit her, but she did not engage in physical altercations with her current boyfriend, J.M.

The social worker also interviewed J.M.  He said that he and mother moved in together about two or three years ago.  When asked if E.V. was his son, he said he was not sure, since mother was sleeping with other men at the time E.V. was conceived.  Regarding his criminal history, J.M. said he was arrested a year prior for manufacturing cannabis for a dispensary.  He believed that what he was doing was legal, and he did not believe he was endangering the children in the home.  J.M. said he no longer lived with mother.

The social worker received a police report indicating that J.M. did live in the home with mother.  When the probation officer searched the home, J.M.'s clothing and personal items were found in the bedroom.  Also, marijuana was found in unsecured plastic grocery bags, in mason jars, and in Tupperware—all within reach of the children.

The social worker interviewed the children, as well.  She asked C.V. what it was like living with his mother, and he said, "My mom is in jail because of grass.  She had pot, she smokes it."  When shown pictures of the jarred marijuana that was removed from

mother's home, C.V. said, "That's pot . . . [J.M.] makes it." When asked if J.M. lived in their home, he said, "Yeah, he lives there. He sleeps with my mom but I don't like [him] because he spanks me and [E.V.] with a belt and I cry and cry." E.V. agreed that J.M. hit him hard with a belt, and hit him on his face. C.V. said that J.M. also hit mother "all of the time." Both children said they were afraid of J.M.

The social worker interviewed the children's foster mother, and she reported that they were very aggressive children who hit each other often. The foster mother believed they were exposed to a lot of violence in the home because they repeated "violent things that they have heard." She said C.V., age four, cursed at other children in the home and threatened to kill them when angry.

The social worker recommended that mother not receive reunification services, as she had "blatantly repeated the same patterns which led to her four other children's removal."

In late September 2015, the social worker filed amended section 300 petitions for the children, adding allegations under section 300, subdivisions (a) and (b), that mother allowed her live-in boyfriend, J.M., to strike the children with a belt, and that J.M. had a substance abuse problem and exposed the children to marijuana.

The social worker filed an addendum report on November 3, 2015, and noted that the children frequently talked about how mother and J.M. smoked weed and how J.M. hit mother on multiple occasions. The social worker further reported that both C.V. and E.V. had been "acting out." C.V. threw an extreme temper tantrum during an interview,

6

when he could not take a toy home with him. He threw himself on the ground and screamed, and he kicked at people who tried to approach him. The social worker reported that mother often made things worse because she was "all over the place." She was "incredibly hyper," talked fast, and was scattered. The social worker continued to recommend no reunification services because she did not believe they would have any effect on "already engrained patterns of abuse." The social worker noted that mother had participated in two separate reunification plans. She failed to have her children returned to her in the first case, and her parental rights were terminated. C.V. was returned to her care in the second case, after she completed both a family maintenance and reunification plan. However, despite successfully completing counseling, a drug treatment program, and a domestic violence program, mother immediately entered into another violent relationship with J.M. and returned to her drug use. She also had drug manufacturing occurring in her home. The social worker observed that mother could stay clean when monitored by CFS, but would return to drugs, violence, and criminal activity when CFS supervision was withdrawn.

The court held a contested jurisdiction/disposition hearing on December 10, 2015. Mother testified on her own behalf. She denied allowing her boyfriend, J.M., to hit the children with a belt and said she would never allow anyone to hit her children. When confronted with the fact that E.V. disclosed that both she and J.M. hit him with a belt, she still denied it. She claimed E.V. only said that because his older brother, C.V., said it. She added that C.V. only said he had been hit with a belt because he wanted some

7

attention. Mother admitted she was smoking marijuana, but said she had a medical prescription to do so. Furthermore, she denied the allegations that she had marijuana and cannabis extracting materials in the home, within the children's reach. She said those items were kept in the basement. She said she would go down into the basement to smoke marijuana, while the children were upstairs watching television. When confronted with the fact that the police found some of those items in the bedrooms, mother said they were high up in a closet. She further denied there was any domestic violence going on in the home or in her relationship with J.M. As to her previous dependency cases, she admitted that her four other children were never returned to her custody, but were adopted. As to her previous case with C.V., she completed her case plan and was given full custody of C.V. Mother testified that she was currently enrolled in services, including a parenting program, relapse prevention, drug education, a family support group, an outpatient program, a domestic violence batterer's treatment program, and a child endangerment program. She said she completed an anger management program. She was also attending Narcotics Anonymous. When asked why there was so much marijuana in her home, mother simply said she would "buy in bulk because it's a lot cheaper . . . ."

Mother further testified that she did not believe the children were afraid of J.M. She said she stopped being in a relationship with him two weeks prior, and that she was only in a "friendship relationship" with him now. She said she had no plans to get back together with him. Mother testified that she and the children were currently living in

8

J.M.'s mother's home, and she planned on continuing to live there to take care of his mother. Mother said J.M. did not live with them. She further testified that she was dependent on J.M.'s mother since she took care of her, in exchange for living in her home. Mother had no relatives and nowhere else that she could reside. She said that when she eventually got her children back, she would have to get a part-time job and move because she believed J.M.'s mother planned on moving. Mother was not currently looking for a job. She just wanted to get certificates from her classes and then probably pursue her GED, so she could go to photography school.

After hearing closing arguments from counsel, the court acknowledged that mother had clearly made some efforts in her case plan and had been testing clean. However, it did not believe there had been any "actual change going on." Rather, the court believed she had only made "a temporary change just to do what she has to do to get the kids back." The court noted that in her relationship with J.M., mother told him just two weeks prior that their relationship was over; however, she was still deeply entrenched with his family and had no one else. The court did not expect perfection or complete change from mother immediately; however, it sensed that mother lacked credibility in some areas and just "painted a picture" to try and get the children back. The court noted that, if this had been mother's first dependency case, they would be discussing reunification services. However, since this was her third case, and "this has been done before," the court did not see sufficient efforts. The court sustained the petition and declared the children dependents. It also adopted the findings in the

jurisdiction/disposition report, including that there was clear and convincing evidence that reunification services for NV., S.V., T.V., and J.V. were terminated and mother's parental rights were permanently severed, and that mother had not subsequently made a reasonable effort to treat the problems that led to their removal. The court denied reunification services and set a section 366.26 hearing.

ANALYSIS

The Court Properly Denied Mother Reunification Services

Mother argues that the court erred in denying reunification services under section 361.5, subdivision (b)(10) and (b)(11). We disagree.

A. *Standard of Review*

"'In juvenile cases, as in other areas of the law, the power of an appellate court asked to assess the sufficiency of the evidence begins and ends with a determination as to whether or not there is any substantial evidence, whether or not contradicted, which will support the conclusion of the trier of fact. All conflicts must be resolved in favor of the respondent and all legitimate inferences indulged in to uphold the verdict, if possible. Where there is more than one inference which can reasonably be deduced from the facts, the appellate court is without power to substitute its deductions for those of the trier of fact.'" (*Francisco G. v. Superior Court* (2001) 91 Cal.App.4th 586, 600 (*Francisco G.*).)

B. *The Evidence Was Sufficient*

Subdivision (b) of section 361.5 "sets forth a number of circumstances in which reunification services may be bypassed altogether. These bypass provisions represent the

10

Legislature's recognition that it may be fruitless to provide reunification services under certain circumstances." (*Francisco G.*, *supra*, 91 Cal.App.4th at p. 597.) Specifically, "[r]eunification services need not be provided to a parent or guardian . . . when the court finds, by clear and convincing evidence, any of the following: [¶] . . . [¶] (10) That the court ordered termination of reunification services for any . . . half siblings of the child because the parent or guardian failed to reunify with the . . . half sibling after the . . . half sibling had been removed from that parent or guardian pursuant to Section 361 . . . and that, according to the findings of the court, this parent or guardian has not subsequently made a reasonable effort to treat the problems that led to removal of the . . . half sibling of that child from that parent or guardian. [¶] (11) That the parental rights of a parent over any . . . half sibling of the child had been permanently severed . . . and that, according to the findings of the court, this parent has not subsequently made a reasonable effort to treat the problems that led to removal of the . . . half sibling . . . ." (§ 361.5, subd. (b)(10) & (11).)

 1. *Mother Has Not Made a Subsequent Reasonable Effort to Treat Her Problems*

 Mother does not dispute that her reunification services and parental rights as to her four older children were terminated. Rather, she argues that she has made reasonable efforts to treat the problems that led to their removal. The problems that led to the removal of T.V., S.V., and N.V. included mother's history of substance abuse, her failure to follow through on a safety plan initiated by CFS, which included her attending an outpatient substance abuse treatment program, N.V. testing positive at birth for

cannabinoids and mother later testing positive for cannabinoids, and her inability to secure stable housing. The problems that led to J.V.'s subsequent removal included mother's substance abuse history and failure to adequately address it through services offered to her, her history of unstable housing, her failure to provide appropriate care and supervision to J.V.'s siblings, and the removal of J.V.'s siblings from her custody. The social worker here opined that mother had not truly made progress, despite successfully completing a drug treatment program, counseling, and a domestic violence program. The social worker specifically noted that after completing those programs for her previous reunification plans, mother immediately entered into another violent relationship with J.M. and resumed her drug use, which "led to the children being in a home where the adults have been arrested for manufacturing drugs on two separate occasions." The social worker observed that mother could stay clean when monitored by CFS, but would return to drugs and violence when CFS supervision was withdrawn. The social worker opined that mother "demonstrated that she has not made significant changes in that she remains in a relationship with [J.M., even] after learning that her children have reported that they are afraid of him due to him abusing both them and [her]."

Furthermore, the evidence showed that mother still had a substance abuse problem. At the contested jurisdiction/disposition hearing, although she said she used marijuana for medical purposes, mother expressly admitted that she was an addict. She said she would use a water pipe, or bong, down in the basement when the children were watching television upstairs, and then she would go back up. We note that it appeared

12

mother would then provide care and supervision while she was under the influence. Therefore, although mother testified that she was currently participating in an outpatient program, a drug relapse prevention program, a parenting class, and other services, such programs did not appear to be having much effect. The evidence showed that she was still using drugs and the children were well aware of it, she kept significant amounts of marijuana in the home, she was not providing adequate supervision, and she was in another violent relationship with a man who hit her and the children.

In addition, mother still did not appear to have stable housing. At the time of the hearing, she was living in J.M.'s mother's home. Mother said she had no relatives, had nowhere else to live, and was not employed. However, she said that when she got her children back, she would have to get a part-time job and move because she believed J.M.'s mother was planning on moving. Despite her unstable circumstances, mother was not currently looking for a job.

Mother argues that the court "incorrectly focused on her past history in Ventura County in which her parental rights were terminated and not on the intervening case in Los Angeles County in which she successfully reunified." She contends that her successful reunification and dismissal of the dependency case involving C.V. constituted a reasonable basis for the court to conclude that her relationships with the children could be saved. Moreover, she claims that the court here was *required* to grant reunification services, based on her previous successful reunification with C.V. In support of this position, mother cites *Renee J. v. Superior Court* (2002) 96 Cal.App.4th 1450.)

However, the *Renee J.* court simply stated, "If the evidence suggests that despite a parent's substantial history of misconduct with prior children, there is a reasonable basis to conclude that the relationship with the current child could be saved, the courts should always attempt to do so." (*Id*. at p. 1464.) Here, there was no reasonable basis to conclude that mother would be successful, if given more reunification services. As the court noted, this was mother's third dependency case, and, even after going through 12 months of reunification services in the first case and being given more services in the second case, she still had not made any real changes. Mother asserts that she was not required to have cured the problems that led to removal. However, the court did not apply that standard, as it expressly stated that it "[did not] expect perfection or complete change immediately." Furthermore, contrary to mother's claim, the court was not required to grant her services simply because her previous dependency with C.V. was closed. The fact remained that reunification services for the children's siblings were terminated in Ventura County, and her parental rights were terminated. In view of her current circumstances, which demonstrated that she had not made a reasonable effort or any real changes, the court properly denied mother services under section 361.5, subdivision (b)(10) and (b)(11).

Mother further asserts that the court "erred when it improperly concluded it was fruitless to offer [her] reunification services and applied a best interest standard." She contends that the court "applie[d] an incorrect standard in bypassing services to [her]." At the same time, she claims the court did not specifically find that she had failed to

14

make reasonable efforts and that section 361.5, subdivision (b)(10) and (b)(11), applied. Mother appears to be arguing that the court erred by denying her services using a "best interest standard." However, she is confusing the "reasonable efforts" and "best interest" analyses in section 361.5. The court found that mother lacked credibility, and she "painted a picture so as to try to get the child[ren] back." The court added that it "[did not] believe that there [was] an actual change going on." The court pointed out that mother had been through reunification services before, and it expressly stated, "I don't see sufficient efforts being this is the third time." The court then adopted the findings in the jurisdiction/disposition report, including the specific findings under section 361.5, subdivision (b)(10) and (b)(11). Thus, contrary to mother's claim, the court specifically found that she had failed to make reasonable efforts and that section 361.5, subdivision (b)(10) and (b)(11) applied. Moreover, the court did not apply a "best interest standard," as mother asserts. Section 361.5, subdivision (c), provides that: "The court shall not order reunification for a parent or guardian described in . . . subdivision (b) unless [it] finds, by clear and convincing evidence, that reunification is in the best interest of the child." The court here did not order reunification services for mother, so no best interest finding was needed.

Ultimately, mother continued to have the same issues that led to the removal of her older children, and she had not made any real changes that would indicate an ability to parent the children. She was back to using drugs, not providing adequate supervision for her children, exposing the children to domestic violence, and still did not have a

15

stable living situation.  In view of the evidence, the juvenile court could easily conclude that mother had not made a reasonable effort to treat the problems that led to her older children's removal.  Therefore, the court properly denied her reunification services.

## DISPOSITION

The writ petition is denied.  The request for a temporary stay of the section 366.26 hearing is also denied.

NOT TO BE PUBLISHED IN OFFICIAL REPORTS

HOLLENHORST
Acting P. J.

We concur:

McKINSTER
J.

MILLER
J.