Filed 4/12/16  A.R. v. Superior Court CA2/8

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION EIGHT

| | |
|---|---|
| A.R.,<br><br>      Petitioner,<br><br>      v.<br><br>THE SUPERIOR COURT OF LOS ANGELES COUNTY,<br><br>      Respondent;<br><br>LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES et al.,<br><br>      Real Parties in Interest. | B268575<br><br>(Los Angeles County<br> Super. Ct. No. DK01760) |

ORIGINAL PROCEEDING.  Petition for extraordinary writ.  (Cal. Rules of Court, rule 8.452.)  D. Zeke Zeidler, Judge.  Petition denied.

Children's Law Center of Los Angeles, CLC1, Ronnie Cheung and Melissa Dimick for Petitioner.

No appearance for respondent.

Mary C. Wickham, County Counsel, R. Keith Davis, Acting Assistant County Counsel, and Sarah Vesecky, Deputy County Counsel, for Real Party in Interest Los Angeles County Department of Children and Family Services.

\* \* \* \* \* \* \* \* \*

A.R. (mother) is the mother of three children, the youngest of whom is one-year-old Joshua R. In this writ proceeding filed pursuant to rule 8.452 of the California Rules of Court, mother challenges the juvenile court's order denying her reunification services with Joshua and setting a hearing for the selection and implementation of a permanent plan (Welf. & Inst. Code, § 366.26).[1]

The juvenile court denied mother reunification services pursuant to the bypass provision in section 361.5, subdivision (b)(10), which authorizes the juvenile court to deny services if it finds by clear and convincing evidence that the parent had previously failed to reunify with a sibling of the child in question and that the parent "has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling . . . of that child from that parent."

In her petition, mother claims substantial evidence does not support the juvenile court's finding that she failed to make a reasonable effort to treat the problems that led to the removal of Joshua's two older siblings, with whom she had failed to reunify. Alternatively, she claims that, even if substantial evidence supports the no reasonable effort finding, the juvenile court "should have found that reunification services would be in the child's best interest," a finding which would have enabled the juvenile court to award mother reunification services notwithstanding the applicability of the bypass provision. (See § 361.5, subd. (c).)

The Los Angeles County Department of Children and Family Services (Department) opposes the granting of relief.

We conclude that substantial evidence supports the juvenile court's no reasonable effort finding, as well as its finding that reunifications services would not be in Joshua's best interest. Accordingly, we deny the petition.

---

[1] All statutory references are to the Welfare and Institutions Code.

**FACTUAL AND PROCEDURAL BACKGROUND**

*1.    The Initial Dependency Petition Filed on Behalf of Joshua's Siblings and the Siblings' Detention*

The first dependency petition filed in this case had its origins in a referral the Department received in September 2013, one year before Joshua was born. At the time, mother had two children – approximately two-year-old E.R. and approximately four-month-old Anthony R. The referral alleged that the children were the victims of emotional abuse and neglect, and that mother and the boys' father, F.R. (father), had engaged in a physical altercation in the children's presence, leaving mother with bruising on her forearm, shoulder and thigh.[2] According to mother, father warned her that she had "[b]etter not report [the incident] or else." Mother also claimed there had been other domestic violence incidents, but she had never reported them.

A few weeks later, the Department obtained a removal warrant for E. and Anthony, detained them and filed a dependency petition (§ 300) on their behalf.

In March 2014, the juvenile court sustained dependency allegations that (1) mother and father have a history of engaging in violent physical altercations in the children's presence, (2) mother has mental and emotional problems, including suicidal ideation and a prior suicide attempt, and (3) father was a current abuser of alcohol and was under the influence on multiple occasions when Anthony was under his care and supervision, and that mother knew of the alcohol abuse and failed to protect the children. After sustaining the petition, the court ordered reunification services for both parents. It ordered mother to participate in individual counseling and parenting classes, and to take psychotropic medication. Father was ordered to participate in counseling and various

---

**2**    Father is not a petitioner in this writ proceeding. He is married to mother and is the biological father of Anthony and Joshua. He was also found to be the presumed father of E., though a different man was determined to be E.'s biological father. The whereabouts of E.'s biological father have been unknown throughout the dependency proceeding and he is not involved in this writ proceeding.

classes, as well as to attend AA or NA meetings and to submit to random drug and alcohol testing. Both parents' visits with the children were to be monitored.

Joshua was born in September 2014. The family agreed to voluntary family maintenance services for him and he was not added to his siblings' dependency proceeding at that time.

2. *Siblings' Placement With Mother, and Father's Positive Alcohol Test*

In October 2014, the juvenile court placed Joshua's older siblings with mother on condition that she continue to comply with the case plan. In April 2015, the court authorized father to reside in the same home on condition that both parents remain in compliance with the case plan.

In May 2015, father tested positive for alcohol. Initially, he denied using alcohol, claiming the positive test must have been due to pain medication he was taking. Mother denied having any knowledge of father's alcohol consumption. A few days later, however, father admitted consuming three beers at a family gathering. He claimed mother, who was at the same family gathering, did not know he had consumed alcohol. In late June 2015, father enrolled in a six-month outpatient drug and alcohol program.

3. *The Dependency Petition on Joshua's Behalf and the Supplemental Petition for a Sibling*

In light of father's violation of the case plan and his lying about the alcohol consumption, the Department believed the children were at risk. Therefore, in late June 2015, the Department filed a dependency petition (§ 300) on Joshua's behalf and a supplemental dependency petition (§ 387) on behalf of Anthony.[3]

The allegations in Joshua's dependency petition mirrored those contained in the sustained petition filed on behalf of his siblings, namely, that the parents had engaged in physical altercations in the children's presence; that mother suffered from mental and emotional problems; and that father was an abuser of alcohol, a fact known to mother

---

[3] Shortly before these petitions were filed, the Department obtained an order authorizing the Department to remove Anthony and Joshua from father. The oldest child, E., was not named in the removal order or in the supplemental petition.

4

who had failed to protect the children. The petition also alleged that Joshua's sibling Anthony was a current dependent of the juvenile court.

The detention report noted that the family had already received 18 months of reunification services.

At the detention hearing that took place in late June, the court ordered Joshua and Anthony detained from father and released to mother. The court directed the Department to provide family maintenance services to mother. And it authorized father to have only monitored visits with the children at a neutral setting. Mother was not to serve as the monitor.

4.      *Mother's Entrustment of Children to Father and the Children's Detention*

About two weeks after the detention hearing at which Joshua and Anthony were released to mother, the Department received a call from father, informing the Department that mother had left the three children with him a day or two earlier and he did not know her whereabouts.[4] According to father, mother called him and asked if she could leave the children with him while she attended a church retreat with her sister. Father stated that he knew he could not have the children in his care. He thought mother would return within four or five hours. When she did not, he began calling and texting her frequently, but she did not respond. Father was worried that mother might be depressed and suicidal.

After his phone call to the Department, father brought the children to a Department office. That same day, a Department social worker called mother and left her a voicemail message advising her of father's call. The following day, the social worker spoke with mother. She claimed father had contacted her and asked if he could take the children to the movies. She said she was "stressed out" because she had to take care of the kids alone. She thought she had an "understanding" with father and did not think he would call the Department.

---

[4]      It is not entirely clear from the record whether father called the Department one or two days after mother had left the children with him. The latter appears to be correct. It appears mother left the children with father on a Friday or Saturday, and father called the Department and brought the children to a Department office the following Monday.

5

Mother also told the social worker that her relationship with father had ended, but they were "keeping up a front" for the social workers "until the case ended." Mother said she and father intended to go their separate ways once the court terminated jurisdiction. Mother disclosed that the "last straw" for her was a domestic violence incident that took place in mid-June 2015 (about a month earlier). According to mother, father became upset when she refused to let him see a text message she was sending. While mother was carrying Joshua, father began to choke her and pull her hair, causing her to fall to the ground with Joshua. Father continued to choke her while she was on the floor. Mother admitted hitting father back.

Mother claimed father texts her more than 20 times a day, asking who she is with and calling her a whore and other names. Mother claimed that father also hit his brother and sister and that he "blacks out" and does not know what he is doing when he gets upset. Mother told the social worker she did not report the domestic violence incident in June because she knew she would have to do more classes and it would prolong the dependency case.

The social worked asked mother about her knowledge of father's alcohol use. Mother responded by asking if "this [is] going to affect me" and then acknowledged that father drinks every other weekend. Mother stated that when she dropped the children off with father before going on the retreat, she observed an 18-pack of beer in the refrigerator. She nonetheless left the children with father.

On the same day she spoke with mother, the Department social worker also spoke with father, who claimed mother goes back and forth between loving, hating and ignoring him, and between leaving him and coming back to him.

Three days after father left the children with the Department, the Department filed an application for an order pursuant to section 385 (authorizing the court to change, modify or set aside a prior order) in which it sought to have Anthony and Joshua detained from mother. At the conclusion of the detention hearing that took place that same day, the court granted the section 385 application. It modified its prior home of mother order,

directed that Anthony and Joshua be detained, and authorized mother and father to have monitored visits.[5]

5.      *The August 2015 Jurisdiction and Disposition Report*

In August 2015, the Department submitted a jurisdiction and disposition report in connection with the recently filed petitions – the section 300 petition filed on behalf of Joshua; the section 387 supplemental petition filed on behalf of Anthony; and the section 342 subsequent petition filed on behalf of E.

The report noted that mother was transient and was living with family and friends at different locations.  She maintained contact with the Department and was provided with monthly bus passes and transportation funds.  Mother was also staying intermittently with father at an apartment he had recently secured with another person.

According to the report, mother stated during a recent interview that, as a child, she received services from the Department due to her mother's neglect.  She did not reunify with her mother.

Mother had attempted suicide on three occasions, at the ages of 13, 15 and 16, respectively.  Mother was pregnant during her last attempt.  On that occasion, she attempted to run into traffic, but her foster mother pulled her back.  Mother claimed she has not experienced any suicidal ideations since that last attempt.  Mother stated she was diagnosed with depression and given medication, but her previous psychiatrist took her off the medication.

Mother reported that she had completed a parenting class, but she was not attending individual counseling as ordered by the court because she was working and attending school, and because she did not have a home.

Mother stated she was married to father.  She admitted experiencing domestic violence at the hands of father "a couple of times."  She said she called police only once.

---

[5]      A little over a week later (in late July 2015), the Department filed a section 342 subsequent petition on E.'s behalf, adding to the previously filed petition allegations that he was at risk because of the domestic violence incident in June 2015 and because mother had left him with father knowing he was an abuser of alcohol.

She denied any recent episodes of domestic violence and denied that father had recently struck her. (As discussed above, mother had recently complained that she was the victim of domestic violence in mid-June 2015, only about six weeks before the interview discussed in the jurisdiction report.)

Mother also denied ever seeing father abuse alcohol. She stated that, at most, she had seen father drink one or two beers.

Mother explained that she left the children with father a few weeks earlier because she was feeling stressed and needed a break. She confirmed that she was aware of the court order that prohibited father from being alone with the children. Mother said she called father and asked if he could take the children so she could go on a retreat with her sister. She did not advise the social worker because she did not want the children removed from her care. Mother stated she did not believe father would call the Department. She also confirmed that she was aware of father's texts and calls, but she did not respond because she felt the children were safe with father.

Mother said she resented father and did not believe she would resume a relationship with him. A few days later, however, father confirmed mother was staying with him intermittently and they remained intimate.

When father was interviewed, he claimed there had been only one domestic violence incident and it occurred several years earlier. According to father, on that occasion, mother became jealous when she discovered he was texting a female friend. Father claimed he tried to leave, but mother grabbed a knife and threatened to kill herself. Father tried to grab mother's arm in an effort to take the knife away. Father claimed he was cut. He also stated that mother suffered slight bruising when he restrained her on the ground. He denied striking or pushing mother or pulling her hair. He claimed mother called police the following day because her sister persuaded her to do so.

Father denied ever having a drinking problem. He claimed he had consumed alcohol only once since the dependency case was opened. On that occasion, he drank three 40-ounce beers and claimed mother was unaware he did so. He denied ever being intoxicated. He was currently attending a drug and alcohol rehabilitation program.

8

Father also discussed the recent incident in which mother left the children with him for three days. In addition to information he had previously provided to the Department when he brought the matter to the Department's attention, father stated that when mother left the children with him and disappeared, the children slept at his work (a piñata factory), on mattresses he placed on the floor.

The report stated that the parents had visited the children and were in partial compliance with the case plan orders. A social worker had observed one visit by mother in early August 2015, during which she interacted appropriately with the children.

According to the report, the parents continue to downplay and minimize the instances of family violence. The Department opined the parents were likely to continue placing their children at risk without comprehensive treatment.

The report also advised that E. had recently been "diagnosed with behavioral concerns." His behavior was out of control and he was placing others in danger. Among other things, he kicked the children's foster mother on multiple occasions and kicked, struck, pulled the hair of, and threw toys at his younger siblings. According to the foster mother, Anthony would imitate E.'s behavior by kicking and pulling aggressively at Joshua. A decision was made to place E. in another foster home. After the move, Anthony's aggressive behaviors ceased.

The Department recommended that the court sustain the various petitions before it and that it continue to provide parents with reunification services.

6.      *The Adjudication Is Continued After the Department Recommends No Additional Services for Joshua's Siblings and No Services for Joshua*

Before the scheduled adjudication in late August 2015, the Department submitted a last minute information form to the court in which it advised that the 18-month review date for E. and Anthony had already passed. Therefore, the Department was recommending that the court not award additional reunification services as to them. It also recommended that the court not award reunification services with respect to Joshua pursuant to section 361.5, subdivision (b)(10) which, as discussed more fully below, authorizes the juvenile court to deny services if the parent failed to reunify with a sibling

9

of the child in question and the parent "has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling . . . of that child from that parent."

In light of the change in recommendation, the court continued the adjudication to October 2015.

7.      *Additional Department Reports in October 2015*

In early October 2015, the Department filed a status report and a supplemental report. The status report concerned only E. and Anthony. In it, the Department noted that mother was not enrolled in any programs. Mother said she called different agencies to enroll in a domestic violence program, but there was a long waiting list. Mother asked whether the children could be returned to father because he had been doing what the court had ordered, while she had not.

According to the foster parents, the visits of both parents with the children were going well. The children were excited to see the parents and cried when they had to leave.

The supplemental report purported to cover the cases of all three children. It advised that the parents were living together in a rented bedroom of a three-bedroom apartment. The rest of the apartment was occupied by friends. Father and mother were also working together.

Since the last court hearing, the parents had communicated consistently with the Department, except for a period of about one week when the social worker was unable to reach them because they did not have access to a phone.

When interviewed in September 2015, mother admitted telling the social worker that father had choked her while she held Joshua in June, but she claimed she had lied because she was angry with father for calling the Department after she left the children in his care. Father was interviewed that same day and also denied the domestic violence incident.

At the interview in September, the social worker encouraged mother to enroll in individual counseling and domestic violence classes. Mother stated she intended to do so. She had previously completed individual counseling in April 2015, several months

before the children were detained in July. The social worker spoke with the therapist who had seen mother at the time. The therapist stated counseling was terminated after mother successfully met her treatment goals. However, the therapist was unaware of any of the subsequent allegations.

In early October 2015, mother located a domestic violence program which consisted of 12 classes, but the Department advised the program was not acceptable. Mother stated she would participate in any program suggested or ordered.

The supplemental report also stated that the parents visits were going well. The parents visited Anthony and Joshua every Sunday and had not missed any visits. The children responded well to the parents.

There was no change in the Department's recommendation. However, the Department stated in the report that, "despite this recommendation of no [family reunification], the court should be aware that the parents have consistently visited the children, that they have maintained contact with the Department, that they seem to have been in partial compliance prior to the filing of the most recent petitions, and they seem motivated to participate in further treatment orders made."

8. *Adjudication of the Siblings' Supplemental and Subsequent Petitions.*

The parties appeared in court on October 7, 2015. The court elected to begin with the adjudication of E.'s subsequent petition (§ 342) and Anthony's supplemental petition (§ 387) before considering Joshua's petition (§ 300), which mother's counsel conceded was within the court's discretion.

After the court admitted the various reports discussed above and took judicial notice of all sustained petitions and prior orders, father's counsel called father as a witness. Father testified that he had been living with mother for the previous three months.

Father claimed the only time he consumed alcohol since the start of the dependency proceeding was during the family gathering in May 2015. He claimed he drank only two beers, not three as the social worker had reported. He agreed, however, that they were "large." He again insisted mother did not see him drink the beers. Father

11

stated he has been attending drug and alcohol classes and is about to "redo" the domestic violence class.

Father testified about the occasion in July 2015 when mother left the children with him and disappeared for several days. He confirmed that he knew he was not permitted to have the children. He denied calling the Department to let them know he had the children because he was mad at mother. He called because his work place was not a suitable place for the children to stay. Father acknowledged arguing with mother after he delivered the children to the Department, but denied there was any domestic violence. Father claimed he and mother have not argued since that time. Father also denied that a physical altercation with mother took place in June 2015 as mother had previously claimed (before she recanted).

After father testified, mother's counsel called the Department's dependency investigator (DI) assigned to the case. The DI was assigned to the case only two months earlier, in August 2015. The DI received a parenting certificate for mother and a progress report from mother's former individual counselor, reflecting that mother had completed counseling satisfactorily. The DI spoke to the individual therapist by phone, but the DI was unable to obtain any information because the therapist said she would need mother's consent.

The DI testified that the monitor for mother's visits with the children advised that mother visits consistently with all children. The DI observed one visit and described mother as attentive and affectionate; overall, "it was positive."

According to the DI, the Department could not approve the domestic violence program mother had identified in the past because it offered only 12 classes and that was insufficient. The DI encouraged mother to find another domestic violence program. The DI would prefer that mother start a domestic violence program before considering liberalizing her visits with the children. The DI believed mother "lacks insight, acknowledgment [and] recognition" when it comes to domestic violence. Given mother's relationship with father and the fact they typically travel together for visits, the DI would have concerns about unmonitored visits for mother.

12

Both parents have consistently told the DI that the domestic violence incident in June 2015 did not occur. The DI found mother's statement that she made up the domestic violence allegations against father to be "questionable."

The last witness to testify was mother. She again maintained that the domestic violence incident in June 2015 did not occur. Mother said she made up the allegation because she "got mad at the father for turning in the kids." Mother claimed there were no physical altercations with father since the dependency proceeding began in 2013.

Mother knew that she was not supposed to leave the children with father when she did in July, but she was "stressed out" due to the fact that father was not living with her and she had to care for the children on her own. He was the only person on whom she could rely.

When mother left the children with father at his work place, she saw the beer in the refrigerator. She claimed the beer belonged to father's friend, who was the "partner that he worked for." Father did not appear to be under the influence at that time. Mother left the children with father, even though she knew that the children had been removed from father's custody a couple months earlier because he had been drinking.

Mother testified that after leaving the children with father, she went to a retreat in Big Bear, where there was no cell phone reception. She later saw that father had called her 16 times and had sent her 45 or more messages.[6]

Mother claimed that when she told the Department social worker in July 2015 that father drank every other weekend, she was not being truthful. She made up the statement because she was mad at father "for turning in the kids." Mother claimed that she has not seen father drink alcohol at any time since the start of the dependency action in 2013, including at the family party in May 2015.

Mother testified that she completed a parenting class in March or April 2015 and completed individual counseling in late June, just a couple weeks before leaving the

_____

[6] As discussed above, mother told a Department social worker shortly after the incident that she was aware of father's texts and calls, but she did not respond because she felt the children were safe with father. (See p. 8, *ante*.)

13

children with father. She was not currently enrolled in any programs. Mother was trying to enroll in a domestic violence program, but the cost exceeded her budget. She claimed she was on a wait list for individual counseling.

Mother was living in a room she was renting with father. If the children were returned to her, father could leave. Mother said she could get a job to earn more money in order to rent a studio or one-bedroom apartment with the children.

After mother completed her testimony, counsel for the children confirmed she was "aligned with the Department" and she called no witnesses.

The court then sustained the allegations in E.'s subsequent petition and in Anthony's supplemental petition that they were at risk because of (1) their parents' history of engaging in violent altercations in their presence, including the incident in June 2015, and (2) mother leaving the children with father in July 2015, notwithstanding her knowledge that he was an abuser of alcohol and had tested positive in May 2015.

In announcing its decision, the court stated that it did not find mother's recantations regarding domestic violence and her knowledge of father's drinking to be credible. The court observed that mother "still doesn't seem to have any insight regarding the domestic violence, violence control, empower dynamics, as well as father's alcohol abuse."

The court trailed the disposition hearings for E. and Anthony, as well as the adjudication and disposition of Joshua's petition, to the next day.

9.   *Disposition on the Siblings' Supplemental and Subsequent Petitions*

When the parties appeared the following day, the court began with the disposition hearing for E. and Anthony. The court stated it would consider the same evidence it had considered the day before at the adjudication hearing. The court observed that the 18-month review date for E. and Anthony was in April 2015 (i.e., six months earlier).

No additional witnesses testified and the court proceeded to hear arguments from counsel.

Father's counsel asked the court to award father additional reunification services.

14

Mother's counsel asked the court to return E. and Anthony to her custody. She noted that mother had completed parenting and had finished individual counseling as ordered before the children were removed from her in July 2015. Mother admitted making a "huge error" leaving the children with father after he was permitted only monitored visits. Counsel noted that mother had no one else who could support her and, in leaving the children with father and going to a retreat, "she was trying to use the coping mechanism she learned in therapy to take a step back if she was feeling overwhelmed." Counsel emphasized that the parents had visited the children consistently, the visits had gone well and the children interacted well with the parents. In addition, the parents had maintained contact with the Department. They had been in partial compliance with the case plan before the filing of the most recent petitions. Counsel noted that mother was on a waiting list for individual counseling and was trying to find a domestic violence class.

In her argument, counsel for the children opined that "this case is exactly where it was two years ago." Counsel believed that, notwithstanding the reunification and family maintenance services mother had received, mother had not made substantial progress. In addition, counsel did not believe mother's recantation. (Counsel did not specify whether she was referring to mother's recantation regarding the domestic violence, her knowledge of father's alcohol use, or both.)

Counsel for the Department joined in the comments of the children's counsel.

Before the court announced its decision, counsel for father stated that she was joining in the request by mother's counsel that the children be returned to mother. Alternatively, father's counsel asked for a home of father order, noting that father was attending an alcohol program and had made progress.

After finding the parents had partially complied with the case plan, the court terminated reunification services for both parents with E. and Anthony and scheduled a hearing for the selection and implementation of a permanent plan for them. The court ordered monitored visits for the parents and gave the Department discretion to liberalize the visits.

*10.    Adjudication of Joshua's Petition*

Later that same day, the court conducted the adjudication hearing on Joshua's section 300 petition. All parties agreed the court could consider the testimony and evidence presented at the siblings' adjudication the day before. No additional witnesses were called. The court also "incorporated" the arguments of counsel from the siblings' adjudication.

After hearing some additional argument , the court sustained allegations concerning (1) the domestic violence between the parents in the presence of the children and mother's failure to protect, and (2) father's alcohol abuse and mother's knowledge of that abuse. The court dismissed the allegation regarding mother's mental and emotional problems .

The court continued the matter to the end of the month (October) for a contested disposition.

*11.    The Department's Supplemental Report Advising on Father's Deportation and Mother's Enrollment in a Domestic Violence Program*

On the day scheduled for the contested disposition, the Department filed a supplemental report and a couple of last minute information forms.

The supplemental report noted mother had recently advised the Department that father was deported and was temporarily living in Tijuana, Mexico.

According to the report, mother also advised that she had enrolled in a domestic violence program and in parenting classes. The Department had not been able to verify mother's enrollment. Before the contested disposition took place, mother provided the court with a letter reflecting that mother had enrolled in a domestic violence program on October 23 and had attended two classes. The letter from the case manager/instructor for the program stated that mother "was punctual and participate[s] very well."

*12.    Joshua's Disposition Hearing*

The contested disposition regarding Joshua that was scheduled for late October was continued for father's counsel to contact and give notice to father. The hearing finally began on November 12. The court stated that it would consider the same evidence

16

from the adjudication for Joshua which, in turn, had relied on evidence and documentation presented at the siblings' adjudication. The court then admitted into evidence the recent supplemental report and last minute information forms into evidence, as well as mother's letter reflecting her enrollment in a domestic violence program.

Mother's counsel called two witnesses. The first was the DI. He testified that mother was participating in a domestic violence program. The DI spoke to mother's counselor at the program. All she was able to say was that mother had attended two classes. The DI was not aware of any other class mother was attending.

The DI confirmed that, in the past, mother had completed a parenting program and individual counseling. However, mother had not attended any programs since the section 300 petition was filed on Joshua's behalf in late June 2015 and her enrollment in the domestic violence program on October 23.

The DI opined that mother would benefit from continued domestic violence counseling. When asked about the probability that the children could be returned to mother in six months if she continued in her current programs, the DI responded that, "[g]iven her history, it would be difficult." The DI noted that, in June, mother had completed individual counseling at which domestic violence was supposedly addressed, yet shortly thereafter, she disclosed domestic violence by the father.

The DI testified that mother had not missed any of her weekly visits with the children. He stated, as he had at the siblings' adjudication, that he had observed one of the visits and mother was "attentive, affectionate [and] responsive." The visits are monitored. The DI had concerns about the visits being unmonitored due to mother's lack of protective qualities, the recurrence of domestic violence and mother's lack of insight into the dynamics of family violence.

Finally, the DI testified that mother was living with father "prior to his disappearance."

Mother was the second and last witness. She testified that she had completed three domestic violence classes in her current program. She has learned that her relationship with father was not healthy. Mother stated she was not currently in a

17

relationship with father. When asked why the relationship ended, mother stated that it was due to father being detained and the lack of effort on his part to contact her after the detention. After some additional inquiry by her counsel, mother said it was also due to what she had learned in her domestic violence classes.

Mother stated that she has been on a waiting list for therapy for three months and she has an intake appointment scheduled for the following week.

Mother then testified there had never been any physical incidents with father. The incident in June 2015 was "[n]ot physical. Only verbal." However, mother later stated that father pushed her during that incident, while she was holding Joshua. He did not choke her or pull on her hair.

Mother visits Joshua once a week for two hours. He becomes happy when she arrives and hugs her when she leaves. Mother calls the foster mother every day and speaks with her and Joshua for half an hour. Joshua calls her "mom."

Mother confirmed she is still married to father. She does not have money to file for divorce. When asked to characterize her relationship with father, mother responded: "It was domestic violence. Emotionally it was domestic violence."

After mother testified, the court trailed the matter for argument and decision.

The parties returned to court nearly one week later. Counsel for the Department asked the court not to order reunifications services. She maintained that in the more than two years since the Department has been involved, the problems between mother and father have not improved. Indeed, mother was living with father until father "went missing – and it's not clear what the story behind that is." The parents' behavior shows they are not addressing the issues.

Mother's counsel relied solely on a written argument she submitted to the court. In it, mother asked that the court order Joshua placed her home or that the court order reunification services. Mother argued the bypass provision in section 361.5, subdivision (b)(10) did not apply because she had made a reasonable effort to treat the issues that led to the removal of Joshua's siblings. Even if the court determined this was

18

not the case, the court should still find that reunification services were in Joshua's best interest and order such services pursuant to section 361.5, subdivision (c).

Father's counsel stated she had not had any recent contact with father. She joined in mother's request that Joshua be placed with mother.

Joshua's counsel joined in the Department's position that services should not be awarded. Counsel stated she did not believe mother was credible and nothing had changed since the case started.

The court then found by clear and convincing evidence that, among other things (1) Joshua would be at substantial risk if placed with mother, and (2) the court had terminated mother's reunification services with Joshua's siblings and mother had not made a reasonable effort to treat the problems that led to the siblings' removal. The court believed mother's testimony showed she was "very much in denial regarding the [domestic violence] history" and "three [domestic violence] sessions under her belt does not show sufficient subsequent efforts." The court also stated that it could not find by clear and convincing evidence that ordering reunification services for mother was in Joshua's best interest. The court stated: "While the child did reside with the mother for the first year of his life and has been out of her care for the last four months, the court cannot find that is sufficient reason to find that it's in his best interest to grant mother reunification services."

The court then denied reunification services to both parents under section 361.5, subdivision (b)(10), and set a hearing for the selection and implementation of a permanent plan for Joshua.

13.     *Mother's Writ Petition*

Mother filed a writ petition challenging the juvenile court's order setting the section 366.26 hearing for Joshua.[7] She claims substantial evidence does not support the

---

**7**     Previously, mother filed a notice of intent to file a writ a writ petition to challenge the order setting a hearing to select a permanent plan for E. and Anthony. However, a petition was never filed. This petition, therefore, concerns only the order setting a permanent plan hearing for Joshua.

juvenile court's findings that (1) she failed to make a reasonable effort to treat the problems that led to the removal of Joshua's two older siblings, and (2) even if substantial evidence supports the no reasonable effort finding, the juvenile court "should have found that reunification services would be in the child's best interest" and awarded her services as authorized in such case under section 361.5, subdivision (c).

The Department filed an answer to the petition in which it opposed the granting of relief.[8]

## DISCUSSION

1.  *Applicable Law*

    a.      <u>Denial of Reunification Services After Failure to Reunify With a Sibling</u>

    "As a general rule, reunification services are offered to parents whose children are removed from their custody in an effort to eliminate the conditions leading to loss of custody and facilitate reunification of parent and child.  This furthers the goal of preservation of family, whenever possible." (*In re Baby Boy H.* (1998) 63 Cal.App.4th 470, 478; see also § 361.5, subd. (a) [with certain exceptions, "whenever a child is removed from a parent's or guardian's custody, the juvenile court shall order the social worker to provide child welfare services to the child and the child's mother and statutorily presumed father or guardians"].)

    The Legislature has recognized, however, that "it may be fruitless to provide reunification services under certain circumstances." (*Deborah S. v. Superior Court* (1996) 43 Cal.App.4th 741, 750.)  Thus, section 361.5, subdivision (b) contains certain exceptions – known as "bypass" provisions – when reunification need not be ordered. (*In re Allison J.* (2010) 190 Cal.App.4th 1106, 1112.)  "Once it is determined one of the situations outlined in subdivision (b) applies, the general rule favoring reunification is

---

[8]     Briefing in this case was delayed because of the need to correct, and then to augment the record.  Therefore, as part of the order to show cause, we temporarily stayed the hearing for the selection and implementation of a permanent plan for Joshua.

replaced by a legislative assumption that offering services would be an unwise use of governmental resources." (*In re Baby Boy H., supra*, 63 Cal.App.4th at p. 478.)

Currently, section 361.5, subdivision (b) contains 16 bypass provisions. The one at issue here is contained in subdivision (b)(10), which provides:

> "(b) Reunification services need not be provided to a parent or guardian described in this subdivision when the court finds, by clear and convincing evidence, any of the following: [¶] . . . [¶]

> "(10) That the court ordered termination of reunification services for any siblings or half siblings of the child because the parent or guardian failed to reunify with the sibling or half sibling after the sibling or half sibling had been removed from that parent or guardian pursuant to Section 361 and that parent or guardian is the same parent or guardian described in subdivision (a) and that, according to the findings of the court, this parent or guardian has not subsequently made *a reasonable effort* to treat the problems that led to removal of the sibling or half sibling of that child from that parent or guardian." (Italics added.)

As the statutory language reflects, before this bypass may be applied, "the parent must have had at least one chance to reunify with a different child through the aid of governmental resources." (*In re Baby Boy H., supra*, 63 Cal.App.4th at p. 478.) However, more than failure to reunify with a different child is required. The court must also find, by clear and convincing evidence, that the parent "has not subsequently made a reasonable effort to treat the problems that led to removal of the sibling or half sibling of that child from that parent." (§ 361.5, subd. (b)(10).) " 'The inclusion of the "no-reasonable effort" clause in the statute provides a means of mitigating an otherwise harsh rule that would allow the court to deny services simply on a finding that services had been terminated as to an earlier child when the parent had in fact, in the meantime, worked toward correcting the underlying problems.' " (*In re Albert T.* (2006) 144 Cal.App.4th 207, 218, quoting *In re Harmony B.* (2005) 125 Cal.App.4th 831, 842.)

The "reasonable effort to treat" standard is just that. It is "not synonymous with 'cure[]' " (*Renee J. v. Superior Court* (2002) 96 Cal.App.4th 1450, 1464) or even the making of a certain level of progress (*Cheryl P. v. Superior Court* (2006) 139

21

Cal.App.4th 87, 99 (*Cheryl P.*)).  In addition, the question is whether the effort was reasonable, not whether it is likely to result in reunification.  (See *id.* at p. 97 [granting relief after services were denied under section 361.5, subdivision (b)(10) because trial court "essentially adopted a 'fruitless' standard"].)

At the same time, the effort must be "reasonable," not "lackadaisical or half-hearted."  (*Cheryl P., supra*, 139 Cal.App.4th at p. 99.)

As noted, the statute requires a finding that the parent "has not *subsequently* made a reasonable effort to treat the problems that led to removal of the sibling."  (§ 361.5, subd. (b)(10), italics added.)  The term "subsequently" could be construed as referring to the time that has elapsed since the termination of reunification services with respect to the sibling.  However, if reunification services with respect to the sibling are terminated almost simultaneously with the disposition hearing for the child in question, such a construction could mean that a "no reasonable effort" finding becomes "a formality because the parent's circumstances necessarily will not have changed."  (*In re Harmony B., supra*, 125 Cal.App.4th at pp. 842-843.)  We, therefore, agree with the Court of Appeal in *Cheryl P.* that, "when a case involves the almost simultaneous termination of services in the sibling's case and the denial of services at the child's dispositional hearing, the statutory language 'has not *subsequently* made a reasonable effort to treat the problems' (§ 361.5, subd. (b)(10), italics added) refers to reasonable efforts made *since the removal of the sibling*."[9]  (*Cheryl P., supra*, 139 Cal.App.4th at p. 98, last italics added.)

---

[9]     It is not uncommon for a disposition hearing to take place shortly after the termination of reunification services in a sibling's case.  (See, e.g., *Cheryl P., supra*, 139 Cal.App.4th at p. 95 [disposition hearing followed immediately after court terminated services at sibling's 18-month review hearing].)  However, the same standard applies.  (See *id.* at pp. 97-99; *Marlene M. v. Superior Court* (2000) 80 Cal.App.4th 1139, 1148 ["There is nothing within the language of section 361.5 to suggest that it applies only when the subject petition is filed *after* termination of family reunification services in connection with other siblings or half siblings."].)  Indeed, mother does not claim otherwise in her petition.

22

Even if the juvenile court finds that the bypass provision in section 361.5, subdivision (b)(10) applies, the court may still award reunification services, but only if it finds by clear and convincing evidence "that reunification is in the best interest of the child." (§ 361.5, subd. (c).)

As the court observed in *In re Ethan N.* (2004) 122 Cal.App.4th 55, 66, "[t]he concept of a child's best interest 'is an elusive guideline that belies rigid definition. Its purpose is to maximize a child's opportunity to develop into a stable, well-adjusted adult.' [Citation.] To that end, a court called upon to determine whether reunification would be in a child's best interest may, indeed, consider a parent's current efforts and fitness as well as the parent's history." (Quoting *Adoption of Michelle T.* (1975) 44 Cal.App.3d 699, 704.)

b.      The Standard of Review

In her petition, mother challenges two of the juvenile court's factual findings, namely (1) the no reasonable effort finding, which resulted in the denial of services under section 361.5, subdivision (b)(10), and (2) the finding that awarding services to mother would not be in Joshua's best interest which, under section 361.5, subdivision (c), precluded the juvenile court from awarding services. Both findings are reviewed for substantial evidence. (*Cheryl P., supra*, 139 Cal.App.4th at p. 96; *In re Ethan N., supra*, 122 Cal.App.4th at pp. 64-65; *Francisco G. v. Superior Court* (2001) 91 Cal.App.4th 586, 599-600.)

"Under this standard of review we examine the whole record in a light most favorable to the findings and conclusions of the juvenile court and defer to the lower court on issues of credibility of the evidence and witnesses. [Citation.] We must resolve all conflicts in support of the determination and indulge all legitimate inferences to uphold the court's order. Additionally, we may not substitute our deductions for those of the trier of fact." (*In re Albert T., supra*, 144 Cal.App.4th at p. 216.)

2.      *Substantial Evidence Supports the Challenged Findings*

Insofar as the denial of services under section 361.5, subdivision (b)(10) is concerned, mother does not dispute that the first prong of that statute was satisfied; i.e.,

23

that she previously failed to reunify with Joshua's siblings. She argues only that substantial evidence does not support the no reasonable effort finding.

Mother made some effort to treat the problems that led to the removal of Joshua's siblings, at least initially. She completed a parenting program in April 2015 and individual counseling in June 2015. However, mother's words and actions after completing these programs indicate the effort may have been less than whole-hearted. Moreover, in the months that followed – when it mattered most – mother made virtually no effort to treat the problems until the eve of the contested disposition hearing.

Thus, not long after completing her parenting class and only a few weeks after completing her individual counseling, mother intentionally violated the juvenile court's order and left her children with the one person who was not entitled to be alone with them – father. The presence of large quantities of beer in the refrigerator at father's work place did not deter mother from leaving the children with father at work, even though father's positive alcohol test was the reason he could have only monitored visits. And when mother left the children with father, she did not leave them for a matter of minutes or even hours. She left them for several days, during which time she was unavailable, either because she made herself unavailable by ignoring father's many calls and text messages, or because she did not have cell phone reception and made no effort to even check in with father through a landline phone or other method of communication.

As discussed above, when she spoke with the Department social worker after this incident, mother disclosed that the month before, father had choked her and pulled her hair while she was holding Joshua, causing her to fall to the ground with Joshua. Mother said she did not report the incident at the time because she knew she would have to take more classes and it would prolong the dependency case. This is yet another indication that mother was not willing to put in a real and sincere effort to address the root cause of the siblings' removal – her abusive relationship with father.

As also discussed above, during that same interview, mother claimed her relationship with father had ended, but they were "keeping up a front" for the social workers until the case ended. This statement, coupled with mother's actions and her

24

inconsistent and incredible statements regarding her domestic violence history and her knowledge of father's alcohol use, suggest mother was merely going through the motions and was not sincere in her desire to address the problems that led to the initial removal of Joshua's siblings from her custody.

In addition, after the children were detained following this incident in July, mother did not even go through the motions until she realized the court may not award her reunifications services. As the juvenile court stated at the conclusion of the contested disposition hearing, "three [domestic violence] sessions under her belt does not show sufficient subsequent efforts."

Mother emphasizes that she visited Joshua (and his siblings) on a consistent basis and those visits reportedly went well. That is commendable. However, lack of visits was not the problem. Therefore, visiting on a consistent basis is not an effort towards treating the problems that led to the removal of Joshua's siblings.

Considering the deferential standard of review, we cannot say substantial evidence does not support the juvenile court's no reasonable effort finding.

Most of the facts discussed above with respect to the no reasonable effort finding also support the juvenile court's finding that awarding reunification services to mother would not be in Joshua's best interest. Here, however, mother's progress – or lack thereof – is also directly relevant to the best interest finding. In this regard, it is hard to dispute the statement by counsel for the children that, "this case is exactly where it was two years ago." The parenting and individual counseling that mother completed by June 2015 seemed to have no effect on mother. She proceeded to knowingly ignore the juvenile court's order and left all three children with father before disappearing for several days. Subsequently, she offered contradictory statements regarding domestic violence and her knowledge of father's alcohol consumption.

It is not surprising, therefore, that at Joshua's disposition hearing, the DI was skeptical Joshua could be placed with mother, even if she received six more months of services. (See § 361.5, subd. (a)(1)(B) ["For a child who, on the date of initial removal from the physical custody of his or her parent or guardian, was under three years of age,

25

court-ordered services shall be provided for a period of six months from the dispositional hearing as provided in subdivision (e) of Section 366.21, but no longer than 12 months from the date the child entered foster care"]; *Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 843 ["For a child under three years of age at the time of removal, . . . reunification services are presumptively limited to six months"]; *id.* at pp. 846-847 [discussing the varying needs of dependents of different ages and "the legislative recognition that time is of the essence, most especially for the very young"].)

Considering mother's lack of progress and questionable prospects for reunification, we will not second-guess the juvenile court's finding. Moreover, it was mother's "burden to 'affirmatively show that reunification would be in the best interest' of the child" (*Mardardo F. v. Superior Court* (2008) 164 Cal.App.4th 481, 492, quoting *In re Ethan N., supra*, 122 Cal.App.4th at p. 66), and to do so by clear and convincing evidence (§ 361.5, subd. (c)). The juvenile court found mother had not met her burden. Substantial evidence supports the court's finding.[10]

---

[10]     In support of her argument that substantial evidence does not support the finding that reunification services would not be in Joshua's best interest, mother cites section 361.8. That section provides, among other things, that, unless certain conditions are met, section 361.5, subdivision (b)(10) shall not apply "[i]n the case of a child for whom one or both *minor parents* have been adjudged to be dependent children of the juvenile court." (§ 361.8, subd. (b)(1), italics added.) Mother acknowledges that section did not go into effect until January 1, 2016 – after the juvenile court entered its order in this case – and the statute "does not explicitly include any provision for the bill to apply retroactively." More importantly, the statute applies only in the case of a "minor parent," which is defined as "a dependent child who is also a parent." (See §§ 361.8, subd. (c) ["For purposes of this section, . . . 'minor parent' shall have the same definition[] as set forth in Section 16002.5"], 16002.5, subd. (h) [" 'minor parent' refers to a dependent child who is also a parent"]; see also § 16002.5, subd. (g) [" 'child' refers to the child born to the minor parent"].) Mother, who was 20 years old when Joshua was born, does not claim she was a dependent when Joshua was born or any time thereafter.

## DISPOSITION

The writ petition is denied. This court's temporary stay order of February 10, 2016, is hereby vacated.

This opinion is final forthwith as to this court. (Cal. Rules of Court, rule 8.490(b)(2)(A).)

GRIMES, J.

WE CONCUR:

RUBIN, Acting P. J.

FLIER, J.

27