Filed 6/24/24  In re Liana H. CA2/2

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| In re LIANA H. et al., Persons Coming Under the Juvenile Court Law. | B331253 (Los Angeles County Super. Ct. No. 22CCJP04666A-C) |
| DEPARTMENT OF CHILDREN AND FAMILY SERVICES, Plaintiff, v. LIBBY H., Defendant and Appellant; EMMANUEL A., Real Party in Interest and Respondent. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Nancy Ramirez, Judge.  Affirmed.

Linda J. Vogel, under appointment by the Court of Appeal, for Defendant and Appellant.

Karen B. Stalter, under appointment by the Court of Appeal, for Real Party in Interest and Respondent.

Janette Freeman Cochran, under appointment by the Court of Appeal, for Minors.

\* \* \* \* \* \*

Libby H. (mother), the mother of Liana (born June 2015), Lovere (born September 2016), and Lanaya (born May 2019), appeals from a judgment terminating juvenile court jurisdiction with an exit order granting physical custody of the children to their father, Emmanuel A. (father), and permitting mother monitored visitation. Mother contends the juvenile court abused its discretion in (1) requiring mother's visits to be monitored; and (2) granting father tie-breaking authority in choosing a monitor. Mother argues the grant of tie-breaking authority constituted a de facto delegation to father of authority to decide whether mother may visit with her children. We conclude mother forfeited the second issue by failing to raise it in the juvenile court, and further conclude that regardless of forfeiture, no abuse of discretion occurred.

## FACTUAL AND PROCEDURAL BACKGROUND
### Initial investigation

On November 24, 2022, the Los Angeles County Department of Children and Family Services (DCFS) received an expedited immediate referral alleging mother and her boyfriend George P. engaged in a physical altercation at a restaurant with the children present. The family had moved to Burbank from Georgia seven months earlier.

2

Mother and George P. had been arguing inside the restaurant, then went outside, got in their car, leaving the two older children, then aged six and seven, in the restaurant unsupervised. While the adults were arguing in the car, George P. began driving erratically with the youngest child in the back seat not secured by a seatbelt or child restraint. Police responded and arrested mother for domestic violence and George P. was arrested for child endangerment.

In an interview with the social worker, mother reported she and George P., who is not the biological father of the children, had been together for approximately 11 months. The biological father resided in Georgia, from where mother had moved due to domestic violence with father. George P. followed mother to California.

Mother explained while the family was eating at the restaurant, mother and George P. began arguing. George P. threw a cup for reasons unknown, and things escalated. Mother followed George P. to the car with the youngest child, leaving the older two children in the restaurant. She denied any physical altercation. Mother and George P. were living together and continuously engaged in verbal altercations. The mother of George P.'s children had a temporary restraining order (TRO) issued against him. Mother denied the use of drugs or alcohol and denied any mental health conditions other than being autistic. Mother reported all three children were autistic, but functioning properly. The oldest child had an individualized education plan coming up. Mother claimed to be on the verge of going to jail because she continuously brought the children late to school.

George P. also reported he and mother had been together 11 months and attended weekly counseling. George P. attended individual counseling for his temper twice a week. George P. reported the fight in the restaurant was based on a miscommunication. He got in the car to keep the peace and mother followed him with the youngest child to talk, and then slapped him on the back of the head. George P. denied hitting mother during the incident. He claims not to have noticed the

older two children were not in the car. He merely pulled the car out, then stopped. He left the keys in the car, and walked away. George P. denied any physical altercations with mother.

Regarding the restraining order in Georgia, George P. stated his ex-girlfriend falsified documents that he engaged in violent behavior. He denied any mental health concerns. He reported mother is autistic but a good mother.

**Petition and detention hearing**

On November 29, 2022, DCFS filed a petition on behalf of Liana, Lovere and Lanaya pursuant to Welfare and Institutions Code section 300.[1] Count b-1 alleged mother placed the children in detrimental and endangering conditions by leaving them in a restaurant without supervision and by allowing George P. to drive erratically with Lanaya in the back seat, not properly secured in an appropriate child safety seat. Count g-1 alleged mother failed to make an appropriate plan for the children's ongoing care and supervision after she was incarcerated for domestic violence.

A detention hearing was held on November 30, 2022. Mother was appointed counsel and entered a general denial. The court found father to be the children's presumed father and ordered DCFS to exercise due diligence in contacting him.

Mother's counsel proposed stipulated testimony on behalf of mother that mother's criminal charges were dropped, she had not seen George P. since she was released, he was no longer living in her home, and she was willing to enroll in a parenting class and a domestic violence support group, as well as any other programs the court thought necessary, as soon as possible. All counsel agreed to the stipulated testimony, and the court accepted the stipulation.

---

[1] All further statutory references are to the Welfare and Institutions Code.

The court ordered the children detained and vested temporary custody with DCFS. The court set a pre-release investigation hearing date to determine whether release to mother was appropriate. Mother was permitted monitored visitation at least three times a week for three hours per visit.

**Prerelease investigation**

DCFS recommended the court not release the children to mother, as it was premature. Father reported during his relationship with mother she was arrested for domestic violence and deemed to be the aggressor. Father also had obtained a TRO against mother in the past. DCFS had concerns about previous domestic violence.

At the prerelease investigation hearing, the juvenile court ordered the children remain in foster care pending receipt of documents from Georgia. The court continued the existing visitation order and gave DCFS discretion to allow extended and overnight visits between mother and the children.

**Reports and interim hearings**

On January 3, 2023, the dependency investigator spoke with father, who reported visiting via FaceTime with the children, who were happy to talk to him. Paternal grandfather Eugene A. reported mother and father had an "okay relationship" but mother was "very pressing" whereas father was more relaxed. Paternal grandfather claimed to love mother like a daughter and was angry with her for leaving the state without telling him. He was shocked to learn mother had left the kids in a restaurant, claiming she was good at watching the kids. Paternal grandfather thought the children should return to Georgia because father had a nice home and family support. Paternal grandfather offered mother the opportunity to come to live with him, but mother declined. Paternal grandfather had no safety concerns regarding father and the children.

In 2017 mother obtained a 12-month protective order against father, who was required to participate in a family violence

intervention program. A November 2018 charge of felony cruelty against father was dismissed. Father provided supporting documentation. Mother pled no contest to a 2018 count of disorderly conduct against father.

In 2019, mother reported father head-butted her, choked her, punched her, and broke her phone. However, mother had no marks on her, and father denied touching her. No arrests were made due to lack of evidence of a physical altercation. Law enforcement reported mother had a history of making false allegations against father. For instance, mother called the police a week earlier and reported father had hit her, but later confessed she made up the allegation because she wanted police to make father leave the home. Mother tried to get two TRO's against father. The first was denied by the court, and mother did not appear for the hearing for the second.

Mother provided a progress report for her child abuser's treatment program, where she had attended three sessions and was receptive to the program.

Liana, age seven, was interviewed and confirmed mother and George P. were arguing at the restaurant. Liana reported mother said "can you watch my kids" to a lady, adding, "She didn't sit at the table and eat with us, she works there." Lovere, age six, reported "mommy said to stay in the food place" while she went outside to see George. When she was taking too long, Lovere and Liana went outside, where Lovere saw mother and George yell at each other.

Both mother and George P. denied mother hit him, but George had reported to the police that mother slapped him on the head. Mother denied leaving Liana and Lovere alone in the restaurant.

Father wanted the children to live with him. Mother had not told him she was leaving Georgia or that the children were in foster care. Father had a home for the children and everything they needed.

Mother told the dependency investigator the children's caregivers were not answering the phone during mother's scheduled time for calls,

but mother was unable to corroborate this with a screenshot of her call log.  The children's caregivers reported that during a monitored visit, mother was overheard telling Liana to "say that someone was there."  Mother had obtained the caregivers' personal cell phone number and had given it to the children's talent agent, who called the caregivers repeatedly.  Phone visits between father and the minors were going well, and the minors were excited to speak with him.  Liana and Lovere told the dependency investigator they wanted to be with mother.

Father reported good relationships with paternal grandfather and his 11 younger siblings.  He also had a good relationship with paternal grandmother prior to her death a few years earlier.  Father and mother were in a relationship for four or five years.  They began living together in the second year.  Father denied physical altercations with mother, and denied knowing she was autistic.  Father said mother liked to yell and had outbursts. Father recently got his own place and works full time as an Amazon driver.  Father wanted his children to live with him.  He had space, resources, finances, and support from his father and siblings.

Father made his first appearance at the January 17, 2023 adjudication hearing via WebEx.  The court appointed counsel for him.  Father was non-offending and submitted to the jurisdiction of the court.  His request that the children be released to him was denied by the court.  The court also denied mother's request for unmonitored visits, but noted DCFS had continued discretion to liberalize as appropriate.  The matter was set for a contested hearing.

In February 2023, DCFS expressed concern that mother was coaching the children.  For example, it was reported mother had told the children to say her friend Alice was with them in the restaurant when mother left them there.  When asked about this, mother did not respond.  Mother reported she was autistic and was not trying to coach the kids but was reminding them what happened and why they were in foster care.  The social worker reminded mother she was not to speak

about the pending case with the children. Mother replied she was autistic and did not always process everything the social worker said.

Lovere also revealed potential coaching. He informed the social worker his "real dad" was nice to him on the phone. However, his mom told him his "real daddy hit her." Lovere revealed mother told him this on a recent visit at Burger King. Lovere stated, "mommy also told me to say those four words: Mommy didn't hit George. George didn't hit mommy." When the social worker pressed Lovere as to what mother told him to say, Lovere stated, "I only remember she only said four words. That George didn't hit mommy and mommy didn't hit George, and that my real daddy he hit my mom when I was little." Lovere said his real father pulled his mother's hair, but when asked to demonstrate, Lovere clarified, "he almost pulled my mom's hair." When asked about any other incidents between mother and father, Lovere repeated, "she only said those four words." Based on this information, DCFS concluded mother was coaching the children and asked the court to admonish mother not to speak with the children about the case.

Mother picked up a prescription for Lamaya but did not give it to her for one week because the children told her they were fine. Lamaya reported that mother and George had hit each other, and they talk to each other on the phone during visits. Lamaya reported mother hit George in the face and there was a lot of blood.

In a report filed on February 24, 2023, DCFS reported Georgia DCFS conducted a courtesy assessment at father's home and had no concerns. There was food in the pantry and adequate sleeping arrangements for the children. Father had a stable income and an adequate support system and desired to have the children in his care. Father had no criminal history in Georgia and DCFS had no safety concerns. DCFS recommended the court order the children to reside with father and terminate jurisdiction with a family law order granting

father sole physical custody, joint legal custody to mother and father, and monitored visits for mother.

On February 28, 2023, mother and father appeared with counsel. Minor's counsel addressed the new recommendation to close the case with "a home of parent father order." Counsel requested DCFS financially assist father in coming to California to visit the minors in person. Counsel for minors requested DCFS interview father about his plan for the care of the minors if returned to his custody. The court ordered DCFS to provide transportation costs for father to visit the children and to observe the visit and discuss with father his plan of care for the minors if returned to his custody.

In March 2023, father informed DCFS he had located a school and daycare for the children. He had a large extended family to help with child care and support. He had arranged for medical and dental care for the children, and an autism specialist. He was financially capable of caring for the children.

During a visit in early March, the children recognized father, exclaimed "Daddy!" and ran from the playground to greet and hug him. The children willingly engaged with father, who was appropriate during the visit. He was attentive and ensured their safety. Father was observed reviewing colors with Lamaya and giving her praise. Liana stayed within close proximity of father throughout the visit. Lovere and Lamaya repeated "watch me daddy" as they engaged in different activities in the playground. When Lamaya fell asleep, father carried her while Liana and Lovere continued to play. Father remained attentive to Liana and Lovere while he held Lamaya. When the visit was ending, Lamaya was still asleep, but Liana and Lovere asked to have more visits with father and asked about the next visit. Overall it was a good visit. Father was caring and nurturing with the children and they were excited to see him. DCFS continued to recommend the court terminate jurisdiction with a "home of parent father order" and a family law order granting father sole physical

custody, with joint legal custody to mother and father and monitored visits to mother.

Mother was participating in domestic violence counseling and parent education. She was diagnosed with adjustment disorder with mixed anxiety and depressed mood.

Statements were made by the children about father owning guns. Father admitted owning a gun he purchased the year before, but reported it was not kept in the home, as it was stored in a locked case in the trunk of his car. The children had not lived with father in three or four years, so father was uncertain how they would know he had a gun. Father provided documentation of the gun's registration and receipt of purchase. When asked how he knew father had a gun, Lovere reported having seen it when he was a baby. He added that father's guns were black and blue, and father had 100 guns. Lovere wanted to see his father again and denied being afraid of him. Liana also reported seeing a gun when she was one year old. Liana appeared nervous and did not make eye contact. She was unable to describe the gun. Liana also denied being afraid of father and wanted to visit with father.

The children visited father in Georgia in April 2023. They were excited for the visit, and greeted him with hugs and smiles. The children did well and were happy to be with father and their relatives, including their two-month-old half sister. By the end of the week, all three children reported wanting to stay with father.

During an April 2023 monitored visit, a social worker observed the minors had written on their tablets that they want to go home and return to their school. In response to the social worker's query, mother said that it was a prayer and the children were writing what they felt. After the visit, the social worker interviewed the children separately and privately. When asked about the note on the tablet, Lovere responded that mother told him to write that. When the social worker asked Liana about the writing on the tablet, Liana began to walk and

10

look away.  The social worker informed Liana that she was not in trouble and did nothing wrong.  Liana admitted mother had told her to write those words.

The social worker called mother, and again asked about the notes on the tablets.  Mother said they were prayers for hope.  When asked again if mother told the children to write that, mother admitted she had and became defensive, saying she is always bullied and this is their religion.  Mother began crying, stating she was autistic and having a panic attack.

In April 2023, the social worker asked mother if she was pregnant.  Mother responded it was obvious she was pregnant, and if anyone from DCFS had asked she would have told them.  DCFS had no information concerning the whereabouts of the father of the unborn baby.  In an unannounced visit to mother's home, DCFS found it in disarray and continued to recommend the children be ordered to live with father.

**Progress hearing/settlement conference**

On April 12, 2023, the parents appeared for a progress hearing and settlement conference.  An amended petition, with counts b-2 and g-1 stricken, was received by the court.  Mother waived her trial rights and pleaded no contest to count b-1, which involved the November 2022 altercation with George P.  The court set a contested disposition hearing.

**Disposition hearing**

The contested disposition hearing took place on June 6, 2023.  Mother and father each appeared with counsel.  The juvenile court admitted DCFS's reports, including the most recent report recommending the children be ordered to the home of parent, father, and mother allowed unmonitored overnight visits as well as unmonitored phone and video calls with the children.  DCFS further recommended the case remain open for an additional three months to allow DCFS an opportunity to assess the children in the care of father.

11

However, at the hearing counsel for DCFS asked the court to remove the minors from mother's custody and grant mother monitored visits. Father and the minors agreed. Minors' counsel asked for two months of continued court supervision, but father and county counsel requested termination of juvenile court jurisdiction with a custody order.[2]

Mother argued for return of the minors to her custody and continued court supervision. In the alternative, she asked the court to liberalize her visits to unmonitored, including one overnight visit per month.

Minors' counsel argued mother had a pattern of unaddressed behavior involving domestic violence, which she continued to deny. Further, there was evidence mother was coaching the children. Given mother's conflicting statements about the November 2022 incident at the restaurant, as well as evidence of mother coaching the children, minors' counsel argued there was an adequate basis to remove the children from mother. Counsel asked that mother's visits with the children be monitored pending a psychological evaluation.

In its June 16, 2023 ruling, the juvenile court removed the children from mother and terminated jurisdiction with a custody order awarding sole physical custody to father, joint legal custody to mother and father, and monitored visits to mother pursuant to section 361.2. The court found mother had unaddressed domestic violence behavior and lacked insight, as she continued to deny she had been a perpetrator of violence. In response to mother's request she be given time to work towards unmonitored visits, the court noted that mother absconded

---

[2]    At the hearing, counsel for DCFS stated it was unclear why there was a change in DCFS's recommendation. Counsel indicated, "I don't know [DCFS's] basis for that change in recommendation as it does not appear that there are any new safety concerns as they relate to father. And so I will submit that issue to the court about whether or not the court believes at this time the court would require further supervision of this case."

with the children without telling father. The court found continued supervision of the children unnecessary because they could safely be placed in the care of father.

Father requested that the monitor be a mutually agreed-upon monitor with tiebreaking authority to father. Father further requested that in the absence of an agreement, the visits be monitored by a professional monitor paid for by mother. Mother's counsel made no objection, but requested minimum monitored visitation at least one weekend per month. The court ordered: "Mother to have monitored visits. Monitored by a mutually agreed upon monitor. Father will have tiebreaking authority to decide on the monitor. Father . . . is not to be a monitor. Or there will be a professional monitor paid for by mother. She's to have visits a minimum of one weekend per month, and she will pay for the travel for the visits. She will have monitored virtual and telephonic visits three times a week, three hours per visit, or an age-appropriate duration."

Mother's counsel did not object to the terms of the monitoring, but asked for a modification allowing the visits to take place in Georgia, noting it might be less expensive for mother to travel to Georgia than for the children to come to California. The court agreed to the modification.

On July 19, 2023, mother filed a notice of appeal from the June 16, 2023 orders.

## DISCUSSION

### I. Applicable law and standard of review

The juvenile court released the minors to father and terminated jurisdiction under section 361.2, subdivision (b)(1). Section 361.2, subdivision (b)(1) permits a juvenile court to "provide reasonable visitation by the noncustodial parent." A custody order issued pursuant to this provision "shall continue unless modified by a subsequent order of the superior court."

13

A juvenile court has broad discretion to fashion orders that promote the well-being of dependent children, including all " 'reasonable orders for the care, supervision, custody, conduct, maintenance, and support of the child.' " (*In re Jasmin C.* (2003) 106 Cal.App.4th 177, 180.) A juvenile court's decision to terminate dependency jurisdiction and issue an exit order pursuant to section 362.4 is reviewed for abuse of discretion. (*Bridget A. v. Superior Court* (2007) 148 Cal.App.4th 285, 300.) Under this standard, we may not disturb the order unless the court exceeded the limits of legal discretion. (*Ibid.*)

## II.   Forfeiture

A reviewing court will normally decline to consider a challenge to a ruling if an objection to the ruling was not made in the trial court. (*Kevin R. v. Superior Court* (2010) 191 Cal.App.4th 676, 686.) A parent who fails to object to the terms of a visitation order in the juvenile court may not claim such error on appeal. (*Ibid.*)

Mother argues for the first time on appeal that the juvenile court's order giving tiebreaking authority to father improperly delegates to father the authority to determine whether any visits occur at all. However, mother failed to object in the juvenile court to the terms of the monitoring requirement. When father's counsel asked for mother's monitor to be mutually agreed upon by the parents, with father having tie-breaking authority, mother's counsel made no objection or any mention of her argument here that the order constituted an impermissible delegation of authority to father.

An objection in the juvenile court would have allowed the trial court to address mother's concerns in the first instance. Permitting a challenge under the circumstances is unfair to the court and the adverse party, as it allows mother to take advantage of a possible error on appeal when it could have been easily addressed in the trial court. (*In re Dakota S.* (2000) 85 Cal.App.4th 494, 501.)

14

Mother acknowledges her failure to object in the juvenile court, but asks this court to exercise its discretion to consider her claim on the merits.  Mother argues the facts are undisputed, and application of the forfeiture rule is not automatic where it presents a pure question of law on undisputed facts.  (*Renee J. v. Superior Court* (2002) 96 Cal.App.4th 1450, 1459.)  While this court has discretion to review certain forfeited issues, the discretion of a reviewing court to excuse forfeiture "should be exercised rarely and only in cases presenting an important legal issue." (*In re S.B.* (2004) 32 Cal.4th 1287, 1293.)  Mother has not presented an important legal issue for this court to review.  Instead, the procedure by which a monitor was to be chosen was a discretionary decision based on the facts and circumstances of the case.  Further, "[b]ecause these proceedings involve the well-being of children, considerations such as permanency and stability are of paramount importance." (*Ibid.*)[3]

Mother has forfeited her challenge to the terms of the juvenile court's monitoring requirement.  However, as discussed below, even had mother not forfeited the challenge, the order was not an abuse of the juvenile court's discretion.

## III. The juvenile court did not abuse its discretion in crafting the exit order

### A. *The monitoring requirement*

Mother argues the juvenile court's requirement that all contact between mother and the children be monitored constitutes an abuse of

---

[3]     Mother points to *In re A.C.* (2011) 197 Cal.App.4th 796, as an example of a case in which the court of appeal rejected a claim that review of the exit order was not preserved because mother failed to object in the juvenile court.  While the *A.C.* court mentioned the forfeiture argument, it did not address the issue, therefore we decline to rely on *A.C.* as authority on this point.

discretion.[4]  Mother was granted a minimum of nine hours of weekly telephone calls and video visits, as well as monthly weekend in-person visits.  All such visits are required to be monitored.  Mother points out that DCFS recommended unmonitored visits, and the juvenile court made no reference to this recommendation.  Mother contends the juvenile court did not articulate a rationale for requiring all contact between mother and the children to be monitored, and thus the requirement is arbitrary, falling outside of the juvenile court's discretion.

Contrary to mother's assertion, the juvenile court did articulate a rationale for requiring a monitor.  Specifically, the court found that mother had unaddressed behavior involving domestic violence, denied having been a perpetrator of violence, and had a history of making false allegations against father.  In addition, the court noted mother had absconded with the children, leaving Georgia for California without father's knowledge or consent.  In short, the court expressed concern with mother's credibility and her trustworthiness with the children.  DCFS also articulated concern that mother was coaching the children to say false things.  For these reasons, the juvenile court did not abuse its discretion in requiring mother's visits with the children to be monitored.

B.    *Monitor selection provisions*

Mother also argues the monitor-selection provisions of the exit order are an impermissible delegation of authority to father to determine whether there will be any contact at all between mother and the children.  Mother cites *In re Chantal S.* (1996) 13 Cal.4th 196 for the proposition that a juvenile court may not delegate absolute discretion to determine whether visitation occurs.  (*Id.* at p. 213.)  However, the *Chantal S.* court determined the juvenile court's order in

_____

[4]    As mother argued to the juvenile court that her visits should be unmonitored, mother did not forfeit this issue.

16

that case, which required a therapist to facilitate visits between a father and child, did not run afoul of the rule against delegation of discretion. (*Id.* at p. 214.) Instead of completely delegating authority, the juvenile court specified "that visitation commence in a carefully restricted setting when father's chosen therapist determines that father has progressed satisfactorily." (*Ibid.*)

In *In re T.H.* (2010) 190 Cal.App.4th 1119 (*T.H.*), also cited by mother, the juvenile court terminated dependency jurisdiction over the children and placed them in their mother's custody, allowing supervised visitation by father " 'to be determined by the parents.' " (*Id.* at p. 1121.) The *T.H.* court found this to be "more than simply a delegation of the authority to set the 'time, place and manner' of the visitation—it effectively delegates to mother the power to determine whether visitation will occur at all." (*Id.* at p. 1123.) Unlike the order in *Chantal S.*, this order "gave mother an effective veto power" over father's right to visitation. (*Id.* at p. 1124.)

As illustrated by *Chantal S.* and *T.H.*, a juvenile court may delegate to a third party the responsibility of managing the details of visits, including the time, place, and manner of visits. (*In re Moriah T.* (1994) 23 Cal.App.4th 1367, 1374 (*Moriah T.*).) "Only when a visitation order delegates . . . the absolute discretion to determine whether any visitation occurs does the order violate the statutory scheme and separation of powers doctrine." (*Ibid.*)

The juvenile court in this matter did not delegate "the absolute discretion to determine whether any visitation occurs." (*Moriah T., supra*, 23 Cal.App.4th at p. 1374.) Instead, the court specified that monitored phone or video visits will occur a minimum of three days per week, for three hours per day, plus a minimum of one weekend in-person visit per month. Pursuant to the court's order, mother has the absolute right to these visits, and father has no veto power.

*In re A.C., supra*, 197 Cal.App.4th at page 796 supports our conclusion. In *A.C.*, the court's oral order—which conflicted with its

17

written order—showed the court's intention to order that the parents agree on the monitor to supervise visitation, or if they were unable to do so, the father would choose the monitor. This order "did not constitute an impermissible delegation of authority to determine whether visitation would occur." (*Id.* at p. 800.) The similar order in this matter also does not constitute an impermissible delegation of authority.

Mother argues father could veto each and every proposed monitor, such that there would be no mutually agreed-upon monitor. Mother further argues the financial burden of requiring mother to hire a professional monitor for nine hours a week of telephonic or virtual visits and 48 hours for the once monthly in-person visits is not within the realm of possibility for mother. These objections are largely speculative. There is no evidence in the record suggesting that father would intentionally undermine mother's visits. Father has a large family in Georgia and has indicated his family is willing to assist with the children. In addition, the paternal grandfather stated he loves mother like a daughter and offered mother the opportunity to live with him in Georgia, an offer which mother declined. In the event that mother is unable to visit with the minors, she may enforce her right to visitation in a family law court. (*T.H., supra*, 197 Cal.App.4th at p. 799 [Exit orders " 'become part of any family court proceeding concerning the same child and will remain in effect until they are terminated or modified by the family court' "].)

The juvenile court did not abuse its discretion in requiring mother's visits to be monitored or in giving father tie-breaking authority in deciding upon a monitor.

## DISPOSITION

The judgment is affirmed.

_____

CHAVEZ, J.

We concur:

_____

ASHMANN-GERST, Acting P. J.

_____

HOFFSTADT, J.